MILDRED ALSEVER, by her next friend, M. G. Alsever v. THE MINNEAPOLIS & ST. LOUIS RAILROAD COMPANY, Appellant.

**Scope of Engineer's Employment:** *Railroad liable for injury due to his blowing off steam.* Where a railroad engineer blows off steam in order to frighten children, and a child is frightened so that it falls and breaks a leg, the company is liable; the blowing off of steam being within the scope of the engineer's employment, and the only negligence consisting in the manner and place of doing it.

**Evidence:** DECLARATIONS RES GESTAE: *Made by locomotive engineer.* A declaration of a railroad engineer, who had blown off steam and frightened a little girl so that she fell and broke her leg, that he only did it in sport, made within a minute after blowing off the steam, and as soon as the engineer could reach the point where the injured child was lying, was admissible in an action against the company, as part of the *res gestae.*

*Appeal from Webster District Court.*—HON. S. M. WEAVER, Judge.

THURSDAY, JANUARY 23, 1902.

The defendant appeals from a judgment for damages. —*Affirmed.*

*R. M. Wright* for appellant.

*Botsford, Healy & Healy* for appellee.

Ladd, C. J.—The defendant's train had stopped at Burnside shortly after 12 o'clock m. May 25, 1899. Attached to the engine was a device known as the "McIntosh Blow Off Cock," used for the purpose of cleansing the boiler of sediment by forcing water through it from the bottom at great pressure. At that time the plaintiff, then eight years old, was standing, with other children, on the side of a corncrib, about 7 feet above the ground, and some 20 feet from the engine, looking at it through an opening. In operating the blow-off cock, hot steam or spray was thrown on the crib, and possibly on plaintiff, thereby so frightening her that she fell, breaking a leg. She then moved from the crib to a pile of cobs near by. Her screams immediately brought her father, Cox, and the engineer. The father testified: "A While I was standing near the end of the crib I saw the children at the opening on the east side, and all of a sudden I heard a terrible roar, and I turned and saw a cloud of steam coming from the engine to the crib, and in a moment I heard a cry; and I ran around from the north to the west side of the crib, and found the engineer, Mr. Taft, there, and the child was on a pile of cobs. Q. What, if anything was said by the engineer at that time in reference as to how the accident happened? A. He says, 'I was only having a little fun with the children.' Q. What had you said to him that brought forth the remark? A. I says, 'What is the matter here?' Q. What did the engineer say if anything respecting the accident, and how it was caused, or what he intended to do? A. What he said was that he had no idea of hurting

the children, or hurting any one (I do not know the exact words he used), or something to that effect; but, anyway, that he had no idea òf hurting the children. Q. What else did he say at the same time? A. He said he had no idea of hurting the children,—just for the idea of having a little sport with them, or fun; that he was just going to have a little sport with the children. Q. Was this all said at the one time? A. Yes, sir; this was said not over a minute after I heard the noise from the engine, and the child scream. I would think it was less than a minute. I know that when the child screamed he ran right around there. We all three met there about the same time." The evidence of Cox was to the same effect. The objection interposed by defendant, that this formed no part of the *res gestae,* was overruled. As the crib was on the depot grounds, the court held that the defendant owed no positive duty to plaintiff; and that therefore this evidence was of controlling importance in determining whether the engineer, in blowing off the hot steam or spray, knew that plaintiff was in a place of danger. It will be noticed that the evidence tended to show that conversation occurred within a minute after the use of the blow-off cock, and as soon as the engineer could reach the point where the injured child was lying, to ascertain the result of what had been done. The opening of the blow-off cock, the rush of steam and spray, the scream of the child, the question of the father, the statement of the engineer, all within a few seconds, were so immediately connected as to constitute one transaction. What forms a part of the *res gestae* must of necessity depend on the facts of each particular case. A mere account of a past occurrence, or purely an opinion of what has happened, is to be rejected. Declarations, to be received, should derive credit, not from the declarant, but from their connection with the principal fact of which complaint is made. The rule is concisely stated thus in *Hadley v. Carter,* 8 N. H. 40: "Where

declarations of an individual are so connected with his acts
as to derive a degree of credit from such connection, inde-
pendent of the declaration, the declaration becomes part
of the transaction, and is admissible in evidence." In *Felt
v. Amidon*, 43 Wis. 467-470, in quoting with approval from
the case of *Lund v. Inhabitants of Tyngsborough*, 9 Cush.
36, the court said: "When the act of a party may be given
in evidence, his declarations made at the time, and calcu-
lated to elucidate and explain the character and quality of
the act, and so connected with it as to constiute one trans-
action, and so as to derive credit from the act itself, are
admissible in evidence. The credit which the act or fact
gives to the accompanying declarations, as a part of the trans-
action, and the tendency of the contemporary declarations,
as a part of the transaction, to explain the particular fact,
distinguish this class of declarations from mere hearsay.
Such a declaration derives credit and importance as forming
a part of the transaction itself, and is included in the sur-
rounding circumstances, which may always be given in evi-
dence to the jury with the principal fact. There must be a
main or principal fact or transaction, and only such declara-
tions are admissible as grow out of the principal transaction,
illustrate its character, are contemporary with it, and de-
rive some degree of credit from it." The grounds upon
which such statements have been received are generally con-
curred in. The difficulty has been in drawing a line with
respect to lapse of time after, and the necessary connection
with, the main act, so as to clearly distinguish between
declarations which are admissible and those too remote and
disconnected. In *Keyes v. City of Cedar Falls*, 107 Iowa,
509, the rule to be deduced from our decisions is said to be
that "if they are near enough in point of time to the prin-
cipal transaction to clearly appear to be spontaneous and
unpremeditated, and free from sinister motives, and afford
a reliable explanation of the principal transaction, they are
admissible in evidence." See *International etc. Railway Co.*

v. *Anderson*, 82 Tex. Sup. 516 (27 Am. St. Rep. 902, note
(s. c. 17 S. W. Rep. 1039) ; also *Wilson v. Southern Pac.
Co.*, 13 Utah, 352 (57 Am. St. Rep. 766, note (s. c. 44
Pac. Rep. 1040), where the true rule is accurately and
comprehensively stated thus: "All declarations or exclama-
tions uttered by the parties to a transaction which are con-
temporaneous with and accompany it, or which are made
under such circumstances as will raise a reasonable presump-
tion that they are the spontaneous utterances of thoughts
created by or springing out of the transaction itself, or so
soon thereafter as to exclude the presumption that they are
the result of premeditation or design, and which are cal-
culated to throw light on the motives and intentions of the
parties are admissible in evidence as part of the *res gestae*."
So immediately connected was the engineer's remark as to
how it all happened with what preceded, that it was an explana-
tory exclamation, not merely an excuse or account of what
had been done.  The inquiry to which it was a response
did not necessarily interrupt the connection.  Indeed, the
authorities put little stress on this circumstance.  It is
proper to be considered, however, in ascertaining the con-
nection with the main fact, but not controlling.  Neither
can it make any difference that the statement was made by
an employee or agent, rather than the principal or injured
person.  Declarations are received, as already pointed out,
not on the credit or relation of the declarant, but because
forming a part of the transaction; and it is immaterial by
whom, if by some person whose conduct or condition, about
which the statement is made, can be proven.  *Coll v. Transit
Co.*, 183 Pa. 543 (37 Atl. Rep. 89).  Nor is the fact that
the statement was in the nature of an excuse enough alone
to warrant its exclusion.  The books indicate that many,
if not most, of the declarations admitted as part of the *res
gestae,* are of this character.  If in the nature of an excuse,
however, the fact is important in determining whether the

statement was spontaneous and unpremeditated, or a mere
opinion or conclusion based on a completed trans-
action. The declarations, if made by the engineer,
were but the natural expressions of one so engaged,
upon the discovery of the result of his diversion, and were
so immediately connected in point of time and circumstance
with what he had done as to exclude the probability of medi-
tation, and, as we think, were properly received in evi-
dence as a part of the *res gestae.* As sustaining our conclu-
sion, see *Fish v. Railway Co.,* 96 Iowa, 702; *Hermes v.
Railway Co.,* 80 Wis. 590 (50 N. W. Rep. 584, 27 Am.
St. Rep. 69); *Durkee v. Railway Co.,* 69 Cal. 533 (9 Pac.
Rep. 99); *Union Pac. Ry. Co. v. Elliott,* 54 Neb. 299 (74
N. W. Rep. 628). Undoubtedly decisions are to be found
tending to a contrary conclusion, but, in view of the diffi-
culty courts have experienced in determining what may
properly be proven as included within the *res gestae,* this is
not at all surprising. Some mistakes, under such circum-
stances, were inevitable, and the books are not wanting in
opinions going, as we think, too far in either direction.

II.   The engineer testified that ordinarily he operated
the blow-off cock 10 times a day, and that in doing so on
this occasion he did not notice the children. The defendant
requested the following instruction, which was refused:
"If you find from the evidence that the defendant's servants
were not using the blow-off cock for the purpose of cleansing
the boiler of defendant's engine, but solely for the purpose
of their own,—for their own amusement, and for a pur-
pose of frightening the plaintiff and the other children with
her,—the plaintiff cannot recover in this action."
The engineer was in charge of the engine, and had
control of the blow-off cock. How often and when
to make use of it was necessarily left to his judgment. All
that was exacted of him was that in doing so he exercise
ordinary care. In blowing off the steam he was acting
within the scope of his employment. The negligence con-

sisted in the manner and place of doing so. There was no departure from his employment,—merely failure to exercise care in doing what he was authorized to do. Says Prof. Wharton: "It may have contravened the master's purposes or directions; but a master who puts in action a train of servants, subject to all the ordinary defects of human nature, can no more escape liability for injury caused by such defects than can a master who puts machinery in motion escape liability, on the ground of good intentions, from injuries accruing from defects of machinery. Out of the servants's orbit, when he ceases to be a servant, his negligences are not imputable to the master; but within that orbit they are so imputable, whatever the master may have meant." Wharton, Negligence, section 160. In *Railway v. Sheilds,* 47 Ohio, 387 (24 N. E. Rep. 658, 8 L. A. 464, 21 Am. St. Rep. 840), an employee placed torpedoes, used for signals, on the track in front of the wheels of the caboose in which lady passengers were riding, with the purpose of frightening them by their explosion when being passed over. One of them was afterwards found on the track by some boys, who caused it to explode by hitting it, and injured one of them. In the course of the opinion, affirming the company's liability, the court said: "It is necessary in this and all similar cases to distinguish between the departure of a servant from the employment of the master, and his departure from or neglect of a duty connected with that employment. A servant may depart from his employment without making his master liable for his negligence when outside of the employment of the master, and he so departs whenever he goes beyond the scope of his employment and engages in affairs of his own, but he cannot depart from the duty intrusted to him when that duty regards the rights of others in respect to the employment of dangerous instruments by the master in the prosecution of his business, without making the master liable for the consequences; for the first step in that direction is a breach of the duty intrusted

to him by the master, and his negligence in this regard becomes at once the negligence of the master.   Otherwise the duty required of the master in respect to the custody of such instruments employed in his business may be shifted from the master to the servant, which cannot be done so as to exonerate the master from the consequences of neglect of duty." In *Andrews v. Railway Co.*, 77 Iowa, 669, a fireman had been left to watch the engine, and while doing so unnecessarily blew off the steam; and an instruction that if, "while so in charge or while employed in the discharge of his duties of fireman, he negligently or wilfully let off steam, and thereby frightened plaintiff's horses, and injured plaintiff, the defendant was liable," was approved.   See, also, *Indianapolis Union Ry. Co. v. Boettcher*, 131 Ind. 82 (28 N. E. Rep. 551); *Brendle v. Spencer*, 125 N. C. 474 (34 S. E. Rep. 634); *Cobb v. Railway Co.*, 37 S. C. 194 (15 S. E. Rep. 879); *Chicago, B. & Q. Co. v. Dickson*, 63 Ill. 152 (14 Am. Rep. 114). In *Toledo R. Co. v. Harmon*, 47 Ill. 299 (95 Am. Dec. 489), the plaintiff checked his team to allow the locomotive to pass, but, instead, it stopped; and, though the engineer noticed the horses were afraid, he unnecessarily and wantonly let off steam.   It was contended in that case, as in this, that the act was wanton and wilful and outside of his authority, and that the company was not liable.   Answering this contention, the court said: "He was their servant,—was engaged in the performance of the duty assigned to him; and if, while so engaged, he used the engine put into his possession and under his control to accomplish the wanton or wilful act complained of, why should not the company be held liable? It is said that he was not employed for the purpose, nor directed to perform the act; and it is equally true that they do not employ engineers to inflict injuries through negligence or incompetency, and yet these bodies are held liable for such acts of their servants.   *   *   *   But when employed in the discharge of his duty, or while engaged in operating

their engines and machinery on their road, if he uses such agencies in an unskilful manner or so negligently as to occasion injury to another, or even if while so engaged he wilfully perverts such agencies to the purpose of wanton mischief and injury, the company should respond in damages. They should not be permitted to say, 'It is true he was an·agent, was authorized by us to have possession of our engines, was engaged in carrying on our business, and while so engaged he wilfully perverted the instruments which we placed in his hands to something more than that designed or authorized, and therefore we should not be liable for the injury thus inflicted.' In this case, so far as the record discloses, the engineer was properly engaged in the use of the machinery of the company; and it can make no difference whether the escape of steam was negligently permitted or wilfully done by the engineer, any more than if he had wilfully run his engine against appellee's wagon and team, and thus produced the injury. The question whether or not it was negligently done can, we think, makes no difference in the results." If the company may be held liable for an injury caused by the engineer blowing off steam or a whistle to purposely frighten a team, as many authorities hold, it is not perceived on what principle such liability shall be denied when this is done to frighten children. See 2 Thompson, Negligence, section 1910 *et seq.* We think the true test that stated by Judge Cooley in his work on Torts (page 536): "The test of the master's liability is not the motive of the servant, but whether that which he did was something which his employer contemplated, and something which, if he could do it lawfully, he might do in the employer's name." It was part of the engineer's duty to use this blow-off cock. For all the record discloses, he may then have been operating it to cleanse the boiler. There is no evidence to the contrary. Whether incidentally to cleansing it he engaged in the diversion of frightening the children, or blew off the steam or

spray for that express purpose, however, we think, can make
no difference.   The company had placed in his charge an
instrumentality requiring care in its operation and man-
agement.   He was doing precisely what the company con-
templated he should do when it employed him, i. e. oper-
ating the blow-off cock.   When this was to be done, and how,
as said, was left to his descretion, the use of which was also
contemplated in his employment; and the company was as
responsible for a mistake or wilful perversion of judgment
in its operation, if within the compass of what he was to
do, when amounting to negligence, as for his neg-
ligence, · in doing that which may be conceded to have
been necessary.     Rounds v. Railway Co., 64 N. Y.
129 (21 Am. Rep. 597); Cooley, Torts, p. 534.   This is
well illustrated by the case of Cobb v. Railway Co., 37 S.
C. 194 (15 S. E. Rep. 878), where the company was de-
clared liable for the misconduct of the engineer in wilfully
or wantonly blowing off steam so as to scare a horse and
cause it to run away, but not for the misconduct of the
trainmen, contributory thereto, by shouting.   The engineer
was doing that which he might, but for the proximity of the
horse, lawfully do within the scope of his employment.
Trainmen were under no circumstances engaged to do what
they did.   The one thing was done within the master's busi-
ness; the other, without.   And on this principle Kincade
v. Railway Co., 107 Iowa, 682, and Marion v. Railway Co.,
59 Iowa, 430, are to be distinguished from the case at bar.
Stephenson v. Southern Pac. Co., 93 Cal. 558 (29 Pac. Rep.
234)), relied on by appellant, is not in harmony with the
authorities heretofore cited, and does not meet our approval.

We think the instruction properly refused, and that
the judgment should be AFFIRMED.

WEAVER, J., took no part.