NANIE SUTCLIFFE, Appellant, v. THE IOWA STATE TRAVELING MEN'S ASSOCIATION.

Action on life Insurance Policy: CONVERSATIONS BETWEEN HUSBAND AND WIFE. In an action on a policy of life insurance, the testimony of the wife of deceased to conversations between them prior to the time he was shot is inadmissible, as conversations between husband and wife.

Same: CONVERSATIONS AT TIME OF SHOOTING. Where it is claimed that deceased committed suicide, the testimony of the wife, who was present at the time of the shooting, as to what actually took place and what was said by deceased and those present concerning the shooting, is admissible as part of the *res gestæ*.

Same: ADMISSIONS OF INSURED: WHEN COMPETENT AGAINST BENEFICIARY. A beneficiary in an insurance policy is bound by the admissions of the insured regarding the shooting which caused his death, though suing in her own right, where the same are part of the *res gestæ*.

Same: PRESENCE OF PHYSICIAN. Mere presence of a physician will not render the admissions of deceased inadmissible as confidential communications where the same are not addressed to him or connected with his professional duty.

Evidence: SUICIDE. Evidence considered and found to warrant a finding that deceased committed suicide.

*Appeal from Polk District Court.*—HON. C. A. BISHOP, Judge.

TUESDAY, JANUARY 27, 1903.

ACTION in equity to recover on a certificate of insurance. The only defense interposed was that death was by suicide. Decree for defendant, from which plaintiff appeals.—*Affirmed.*

*John C. King* and *Ryan, Ryan & Ryan* for appellant.

*Wright, Hewitt & Wright* for appellee.

LADD, J.—Frank A. Sutcliffe shot himself in the left side between the ninth and tenth intercostal cartilages and about four inches from the median line, shortly after midnight, February 27, 1899, and died from the effects of the wound so inflicted the next day. The ball lodged in the left side of the spinal column, about two inches above the anus,—eleven inches from the point of entrance into the body. His vest, shirt, and skin were powder stained, and powder had entered somewhat into the wound. He was at the time a member of the defendant association in good standing, and it is conceded that, unless he purposely took his own life, the plaintiff, as the beneficiary named in the certificate of insurance, is entitled to recover. Our only inquiry, then, is whether the defendant has established by a preponderance of evidence that death was by suicide. He had been married in December previous, and, with his wife, was living with his parents in Chicago, Ill. His wife had but recently obtained a divorce from a former husband, who seems to have found his way to the penitentiary, though an improper intimacy had existed between them for more than two years. He was a commercial traveler, had returned to the city the morning of the 26th, and had spent the afternoon and evening with his wife about the city. According to her story, they had visited several saloons, drinking together, he imbibing two or three quarts of beer and a couple glasses of whisky, though in her affidavit, made near the time, she declared he took no more than "two beers." She also testified that they had talked of disagreeable things, and that he had

1. CONVERSATIONS between husband and wife. accused her of infidelity and want of affection. Such evidence, as it was of communications between husband and wife, is prohibited by statute. *Hertrich v. Hertrich*, 114 Iowa, 643.

Of their return she testified that: "My husband opened the door. We went in the house. Went upstairs

together, and I went in my room, and he came in directly
behind me, removed his overcoat, and hung

2. SAME: con-
versations at
time of shoot-
ing.

it up just inside of our room door, and hung
up my umbrella with his coat. He turned
round, and walked out of the room. Just outside of the
room door my trunk sat. On that was his grip. He
walked to his grip, and I was undressing in the room. As
he stepped back into the room, I immediately turned
round, and he just put the revolver to the left side, pulled
the trigger, and I turned so quickly that he fell 'in my
arms, and I laid him on the bed." That immediately his
mother came into the room, followed a moment later by
a sister, and accused her of having killed her son. That
thereupon she inquired of deceased, "Who did it?" to
which he responded, "I did it myself." That the mother
then turned to him, and asked, "Who did this?" to which
he answered, "I did it myself." That she again inquired,
"Are you sure you did it, or did that woman do it?" to
which he responded. "I did it myself, and don't blame
my wife." Appellant insists that this testimony also should
be excluded because of a communication between a hus-
band and wife. We think the conversation had at the
time a part of the *res gestæ*, and what was said by the
mother, wife and deceased in the nature of exclamations
explanatory of what had occurred. *State v. Middleham*,
62 Iowa, 150; *Wright v. Wright*, 114 Iowa, 748; *Alse-
ver v. Railroad Co.*, 115 Iowa, 338. They were spontan-
eous utterances, springing out of the transaction itself;
verbal acts, as it were, rather than communications such
as prohibited by statute.

The credibility of this witness is seriously shaken,
if not destroyed, by her affidavits out of court, and repeated
oral statement to the effect that she was not looking at
deceased at the time the revolver was discharged, but
turned as she heard the report, and caught her husband
when falling toward her, and that she believed the shoot-

:ing accidental. Besides, she had been a prostitute since his death. Were she not strongly corroborated in the essential issue as to self-destruction, her testimony would be entitled to no consideration. A barber on the first floor heard the report, and notified the police. He then went to the scene, and inquired of deceased who did it, and was answered that the latter did. The police sargent and a patrolman soon arrived, made the same inquiry, and received a like response. They then asked why he did it, and were told that it was none of their business. This evidence was objected to, first, because of the incompetency of declarations of deceased against the beneficiary.

3, SAME: admissions of insured: when competent against beneficiary. The latter claims in her own right, and not as representative of or through the assured. *Seiler v. Association*, 105 Iowa, 87; *Rawls v. Insurance Co.*, 27 N. Y. 282 (84 Am. Dec. 280). This being true, the beneficiary is not bound by admissions of the assured, unless a part of the *res gestæ*. *Fitch v. Insurance Co.*, 59 N. Y. 559 (17 Am. Rep. 372). But on this last ground we think the evidence rightly received. The conversations were so closely connected with the transaction in point of time and sequence that they should be treated as a part of it. *Alsever v. Railway Co.*, *supra*; *Harriman v. Stowe*, 57 Mo. 93; *Insurance Co. v. Mosley*, 8 Wall. 397 (19 L. Ed. 437); *Com. v. McPike*, :3 Cush. 181 (50 Am. Dec. 727).

Appellant suggests that they should be rejected because of the presence of the physician treating deceased. The communications were not to him, nor in any manner 4. SAME: presence of physician. connected with his professional duties. His mere presence alone did not render the communications confidential when not such in fact. *State v. Swafford,* 98 Iowa, 362.

But even were all these objections conceded to be well taken, the plaintiff proved precisely what these witnesses

testified to by Dr. Shepstone, and farther, that deceased

5. EVIDENCE: suicide. had told Dr. Henderson, who operated on him at the hospital, that he "did it himself alright," and this without explanation to either of how it happened. This witness also testified that when the wife came for him immediately after the shooting she had urged him to hurry, as they had accused her of shooting her husband, that he might make a search to see whether it was accidental or otherwise, and that as soon as they reached the scene she had said in presence of witness and mother, "Frank, who did it?" to which deceased responded, "I did it myself." As tending to confirm her statement that the mother had accused her as claime 1, the policemen mentioned and another testified that plaintiff said to them, in substance, shortly after reaching the house, and subsequent to the arrival of the physician, that the wife had, by her conduct, driven deceased to do what he had done. It is true, plaintiff denies this, and also insists that at the above interview the wife also asked deceased, "Was it accidental?" to which he answered, "Yes, but don't disturb me now."

The record does not bear out appellant's claim that the doctor's testimony confirms her statement that such a question was asked and answered. The inquiry was made, but he responded by repeating the question and answer first mentioned. In response to an inquiry by him as to how it happened, at another time, no explanation was made. We are satisfied that Sutcliffe never intended to assert that the shooting was other than his voluntary act. Not only did he state repeatedly that he did it, but emphasized his personal responsibility for the act by saying he did it himself, and, when asked how or why, repelled the inquirers, who were interested in knowing, by informing them it was not their affair. That he refused to make any explanation under the circumstances is convincing proof that there was none to make.

The fact that Sutcliffe's wife informed the doctor immediately upon reaching his home that she had been accused of doing the shooting, and the scene upon their arrival at the house as well as plaintiff's statement to the policeman strongly confirms her story that she had been charged by the plaintiff with killing her husband, as she testified. Such an accusation was wholly inconsistent with plaintiff's testimony on the trial that she was standing in her bedroom door, opening into the parlor to the east of the sitting room, saw deceased and his wife pass to their bedroom, saw him return and lean over and open his grip, and put his hands into it, whereupon she heard the report of the revolver, and saw him fall into his wife's arms. She had given testimony at the coroner's inquest, but made no mention of having seen deceased when the gun was discharged. She had made a sworn statement, as part of the proofs of loss, in which the particulars of the accident were called for, without the slightest intimation of having witnessed it. With her attorney and the physician who attended deceased, she had been present when the wife, at the attorney's request, had rehearsed the occurrences of that fatal night, without a suggestion of any knowledge on her part.

Moreover, it is difficult to understand how the ball could have taken the course it did if the revolver discharged accidentaly while lying or being removed from the satchel. It was, when closed, less than twelve inches high, and the top of the trunk was but fourteen and one-half inches from the floor. Deceased stood a trifle less than six feet in height, and, when leaning over the grip his body must have been at least a foot above the top of the grip, and double that distance from the bottom. How was it possible for the ball to take the range it did unless the revolver was much higher than likely in merely handling it within the satchel? It is said the ball might have

deflected. Possibly, but there was nothing to indicate that it had. The wife's account is the more probable, is absolutely consistent with all the established facts of the case, and especially with deceased's conduct and remarks up to the time of his death. It should be added that in support of plaintiff's theory the deputy coroner declared that in about five hundred cases of suicide investigated within three years one-half had died from gunshot wounds all of which save one had been inflicted in the head, and that one in the heart. It also appeared that deceased was intelligent, and likely to know where to shoot in order to avoid subsequent agony. But it will be recalled that, if the wife is to be believed, he had been drinking heavily. This, with possible nervous tenison, may account for lack of precision in what he did. At any rate, the unlikely often happens, and, in view of the other proof, we are convinced that insured took his own life.—AFFIRMED.

BISHOP, C. J., took no part.