CHARLOTTE RODSKIER, Appellee, v. NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY of Milwaukee, Appellant.

No. 41801.

MAY 9, 1933.

Deacon, Sargent, Spangler & Hutchison, for appellant.

Wm. W. Crissman, for appellee.

KINTZINGER, J.—Plaintiff's husband took out a $1,000 life insurance policy in defendant company in November, 1910. His mother was the beneficiary until after his marriage, when the beneficiary was changed to his wife. The policy was fully paid up. The insured left home February 7, 1921, and was never seen since.. He was forty-two years old when he left.

He was happily married having a wife and two children, for whom he had great affection. They were married in April, 1913, and lived together until he left. At the time of his disappearance he was not in good health and, prior to leaving, had lost about twenty-five pounds. When he left he told his wife that he was going to Cleveland to look for a position. The insured had been cashier of a bank and lived at Spragueville, Iowa, for several years. It was conceded he was short about $10,000 in his accounts at the bank, and the evidence fully shows he left home on account of his defalcations.

Although he told his wife he was going to Cleveland, it is apparent he never went there, because he wrote Mr. Stromeyer, the president of the Spragueville Bank, on February 9, 1921, from New Orleans, Louisiana, admitting his defalcations in the bank and that he was on his way to Central America. In this letter he said:

"The money was lost in speculations—that dated back several years. * * * I gambled with money that did not belong to me and lost, but I always hoped that I would win and pay it back. How much I· despise myself you can best realize. Whenever I think of my family—My God it is enough to make any man crazy—and if it had not been for my family I would have made a clean breast of it long ago and taken my punishment.

"A. E. Rodskier."

The plaintiff admitted receiving a letter from her husband dated at New Orleans, February 14, 1921. That was the last letter she

ever received from him. This letter was not admitted in evidence, because of its being a privileged communication. Another letter was received from him on the same day by the president of the bank.

After he left, plaintiff moved to Cedar Rapids. The insured's mother, his surviving parent, lived in Denmark. Plaintiff made inquiry to learn his whereabouts from her and other relatives and neighbor friends in Denmark. She also inquired about him from other local friends, and a Mr. Moeller who was a very close friend of her husband, and with whom she thought he might possibly communicate. She also made inquiries about him from his brother-in-law, Mr. Nelson.

In addition to this, she employed Attorney Redmond of Cedar Rapids to locate him if possible. The people she made inquiries of were the only people that her husband would be likely to write to; that he was reticent and not in the habit of making friends easily. She never received any information of his whereabouts from any of the people she made inquiries of since 1921. In response to inquiries made from his mother and sister in Denmark, she received several letters, substantially as follows:
Exhibit 2.

"Logstor, April 26, 1922.
"My very dear Daughter:

"I don't understand Aage. The last time I had a letter from him, he wrote: You don't understand how I suffer, and when will I get to see those whom I love. He could write to you but perhaps he will not reveal where he is. Would God that you may hear something before long. This suspense is terrible. Accept then the sincerest greetings and kisses from your old mother.

"Antoinette."
Exhibit 3.

"Logstor, June 23, 1922.
"Very sorry to hear about Aage's silence. I don't understand him, but I believe that he is suffering greatly; my poor, dear Aage! No, my dear Charlotte, *you are greatly mistaken if you think that I know anything about his whereabouts or condition. I have received only one single letter. You may be sure that if I hear anything about Aage, I will let you know at once.* I wish that would happen soon. In the letter he asked me for money. He wrote about how unhappy he was; that he went to South America, and that I would hear from him when he had succeeded in getting a position so he could see

his dear ones again. O, Charlotte, be sure that he is suffering greatly from being away from those whom he loves."

Exhibit 4.

"Logstor, Febr. 5, 1923.

"May God bring you the dear Aage back—well and hearty— that is my wish for you and your small children."

Exhibit 5.

"Logstor, May 14th, 1923.

"If you have not heard anything yet, then I do not believe that my dear son is among the living. May God give him comfort, however it is with him! He wrote me at that time, that I should hear from him when he had secured a position, so he could support his family. O, how he must suffer, my poor, dear son, when I recall with what love he spoke about you all. Your true and

"Sincere grandmother."

Exhibit 6.

"Logstor, Nov. 22.

"My very dear Charlotte:

"I have prayed to the Lord for you, hoping that He will make it lighter for you and turn everything to the good. O, dear Charlotte! Have you not heard anything from our dear Aage? But I am afraid you have not or you would have let me know; his picture is standing beside me on my work table, and often I say: 'O, Aage, if I only knew how you are doing.' I wonder if I shall live to see you reunited and happy.

"Your old mother."

His mother died since, and plaintiff heard nothing further.

Attorney Redmond also wrote a letter to the insured's mother in Denmark in 1923 or 1924; and some letters to Judge Ely of Maquoketa, who had been the insured's attorney before his departure. Attorney Redmond also spent considerable time in making an investigation to learn his whereabouts; and kept it up more or less ever since. He tried every way that occurred to him to get into communication with him. During his investigation he learned that nobody who knew him, none of his friends or relatives, knew where he was, or heard anything from him, or knew if he was living or dead.

Plaintiff filed due proof of her claim with the defendant company claiming the insurance because of the insured's death based on his disappearance and unexplained absence from his last known place of residence for more than seven years.

Appellant assigns twenty-seven errors as grounds for reversal. Twenty-four of these errors are based upon the court's ruling on the admission or exclusion of evidence.

I.   Plaintiff testified on cross-examination that she received a letter from her husband on February 14, 1921. Defendant had this letter identified as "Defendant's Exhibit A" and offered it in evidence as part of the cross-examination. Objection thereto was sustained as being a privileged communication between husband and wife.

Section 11262, Code, provides:

"Neither husband nor wife can be examined in any case as to any communication made by the one to the other while married."

It is the settled law in this state and other jurisdictions that all communications between a husband and wife during their married life are privileged. Hertrich v. Hertrich, 114 Iowa 643, 87 N. W. 689, 89 Am. St. Rep. 389; Sutcliffe v. Iowa State Trav. Men's Assn, 119 Iowa 220, 93 N. W. 90, 97 Am. St. Rep. 298; Shuman v. Supreme Lodge, 110 Iowa 480, 81 N. W. 717.

Before ruling on the objection the letter was handed to the court for inspection for the purpose of determining its admissibility. After reading the letter the court sustained the objection. There is nothing in the evidence showing what the letter contained, and we are therefore unable to say that its exclusion was error.

We think the objection to the admission of the letter as being a privileged communication was correct.

It was developed by the cross-examination that defendant sought to show by the contents of this letter that her husband was a defaulter in the bank in which he was employed, and that his absence was explained because of his flight from the scene of his crime. This fact was shown by a letter received by the president of the Spragueville bank and by the concession made by plaintiff in the later progress of the trial. As this fact was fully established without dispute by other evidence, the exclusion of Exhibit A was not prejudicial. Hibbets v. Threlkeld, 137 Iowa 164, 114 N. W. 1045; State v. Schumann, 187 Iowa 1212, 175 N. W. 75; Peterson v. McManus, 187

Iowa 522, 172 N. W. 460; Polk County v. Owen, 187 Iowa 220, 174 N. W. 99.

■ II. Complaint is made of the admission of plaintiff's exhibits 2, 3, 4, 5, and 6, being letters from the insured's mother in Denmark. These letters were written in Danish and were translated by an interpreter. They were all identified as being in the handwriting of the writers. They were clearly admissible as tending to show that inquiries were being made from the persons most likely to have heard from him. We find no error in their admission.

■ III. Complaint is also made of the court's action in sustaining objections to question asked the plaintiff in reference to conversations she had with Mr. Stromeyer, the bank's president, as to the reason of Rodskier's disappearance. There is no prejudicial error in this ruling, because it was later shown and conceded that the cause of his disappearance was his defalcations at the bank. For this reason we find no error.

The rule, as already stated in division 1 hereof, is that there is no prejudicial error in excluding certain evidence when the same evidence was fully established without dispute by other evidence. Hibbets v. Threlkeld, 137 Iowa 164, 114 N. W. 1045; State v. Schumann, 187 Iowa 1212, 175 N. W. 75; Peterson v. McManus, 187 Iowa 522, 172 N. W. 460; Polk County v. Owen, 187 Iowa 220, 174 N. W. 99.

■ IV. Error is also claimed because the court overruled defendant's motion to strike the answer of the witness Attorney Redmond to the following question put to him by the plaintiff:

"Q. Did you or did you not, in the course of your investigation, receive any intelligence concerning A. E. Rodskier or his whereabouts? A. I learned in the course of my investigation that nobody who knew him, his friends or relatives, knew where he was or had heard anything from him or knew whether he was living or dead."

One of the elements necessary to establish the presumptive death was that no knowledge or information had been obtained of him by those most likely to hear. This testimony simply related to these facts and was clearly competent.

Other errors based on the admission or exclusion of evidence are assigned, but while some of the objections might have been technically good, we believe the rulings thereon were not prejudicial.

We do not believe that the rulings on the other objections af-

fected the substantial rights of the defendant herein and for that reason are not reversible error. Code sections 11548 and 11228.

V. Defendant also contends that the court erred in failing to find that the evidence was not sufficient to sustain the judgment, or justify the presumption of the insured's death by his unexplained absence for seven years. This is an action of law, but was tried to the court. The court's findings of fact are therefore binding upon this court, if the evidence offered is sufficient to sustain the verdict of a jury thereon. If the evidence was sufficient to make out a prima facie case, then the finding of the court thereon is conclusive.

The record shows that plaintiff never heard from the insured after February 14, 1921. At that time he was in New Orleans and wrote to the president of the Spragueville bank that he was a defaulter and was on his way to Central America. Before leaving home he told his wife he was going to Cleveland. He evidently did not go to Cleveland, because the information received by the bank contained in a letter written on February 9, 1921, shows that he was at New Orleans at that time and was then leaving for Central America. Other facts are hereinbefore stated.

The presumption of a person's death from long absence is not conclusive, but when it is shown to have continued for over seven years unaccompanied by circumstances which reasonably account for his disappearance on a theory not involving his death, the presumption becomes sufficiently strong to cast the burden of rebutting it upon the parties asserting the continuance of life.

At common law the rule was that a presumption of death arose from an unexplained absence of seven years if reasonable efforts to learn his whereabouts were made. This rule prevails in Iowa and practically all other jurisdictions. 17 C. J. 1167 and note; Werner v. Fraternal Bankers, 172 Iowa 504, 154 N. W. 773, Ann. Cas. 1918A, 1005; In re Barrett's Estate, 167 Iowa 218, 149 N. W. 247; Oziah v. Howard, 149 Iowa 199, 128 N. W. 364; State v. Henke, 58 Iowa 457, 12 N. W. 477; Tisdale v. Connecticut Mutual Life Ins. Co., 26 Iowa 170, 96 Am. Dec. 136; Haines v. Modern Woodmen of America, 189 Iowa 651, 178 N. W. 1010; Lemire v. National Life Ass'n, 194 Iowa 1245, 191 N. W. 67; Axen v. Mo. Life Ins. Co., 203 Iowa 555, 213 N. W. 247; Magness v. M. W. A., 146 Iowa 1, 123 N. W. 169; Seeds v. Grand Lodge, 93 Iowa 175, 61 N. W. 411; Hicks v. Modern Woodmen, 203 Iowa 596, 213 N. W. 236; McCoid v. Norton, 207 Iowa 1145, 222 N. W. 390; Sherod v. Ewell, 104 Iowa 253, 73 N. W.

493; Northwestern Mutual Life Ins. Co. v. Stevens, 71 F. 258, 18 C. C. A. 107.

Our rule is that, in order to warrant a finding of a presumptive death by an unexplained absence for seven years, it must be shown: (1) That nothing has been heard of the person during that period by those persons most likely to hear; and (2) that diligent inquiry on the part of relatives and friends have proved unavailing.

In the case of Axen v. Ins. Co., 203 Iowa 555, 213 N. W. 247, 250, we quote from Northwestern Mut. Life Ins. Co. v. Stevens, 71 F. 258, 18 C. C. A. 107, as follows:

"The various facts of numberless cases will range them between the extreme cases we have supposed. Two cases of disappearance in which the facts are exactly alike will probably never arise, and the strength of the presumption of life or death will never be the same in any two cases. The facts and circumstances surrounding each disappearance which tend to affect the inference of continued life or early death that the minds of reasonable men, anxious only to arrive at the truth, would draw, should be received in evidence in the trial of these cases; and then, guided by the established presumption that one who disappears under ordinary circumstances is presumed to live for seven years thereafter, the fact of continued life or previous death at the important date should be determined by the jury if there is sufficient evidence in the case to warrant a finding that the established presumption has been varied, and by the court if there is no such evidence."

In Lemire v. National Life Ass'n, 194 Iowa 1245, 191 N. W. 67, 68, we said:

"The burden is upon the plaintiff to establish by a fair preponderance the essentials inhering in the presumption, and it must be made to affirmatively appear: (1) That the person has been absent from his home or usual place of abode for seven years; (2) that no intelligence has been received concerning him during said period by those persons who would naturally or likely have heard of or from him, if living; (3) that the person invoking the presumption has made diligent inquiry from relatives and others likely to know to ascertain the whereabouts of the absentee."

It is also claimed that the absence of the insured for more than seven years is fully explained by the fact that he was a defaulter in

his bank. This fact alone is not sufficient to overcome, as a matter of law, the presumption of his unexplained absence for over seven years if reasonable efforts to learn his whereabouts were made. The term unexplained absence does not necessarily mean that if one of the reasons for the disappearance was the commission of a crime, that a presumption of death cannot arise by the absence for seven years. The rule is that a continued and unexplained absence of a person for seven years, notwithstanding efforts of relatives to locate him, creates a jury question on the issue of death, even though the original disappearance occurred when the insured was a defaulter to a large extent. The presumption of death from the unexplained absence for over seven years may, of course, be rebutted and the fact of his being a defaulter may be considered as rebutting evidence. Equitable Life Assur. Soc. v. James, 73 Ind. App. 186, 127 N. E. 11; Axen v. Mo. Life Ins. Co., 203 Iowa 555, 213 N. W. 247.

In Equitable Life Assur. Soc. v. James, 73 Ind. App. 186, 127 N. E. 11, 12, the court said:

"The fact that the insured, at the time of his disappearance, was guilty of the crime of forgery, and may have been a fugitive from justice, was properly admitted in evidence to rebut the presumption of death arising after seven years' absence; but the proof of such fact did not, as a matter of law, overcome the presumption of death."

Other cases of similar import are reviewed in Axen. v. Mo. Life Ins. Co., 203 Iowa 555, 213 N. W. 247, 250.

In the Axen case we said:

"Does the fact that the insured was shown by the evidence to have been a defaulter and to have been a fugitive from justice so 'explain' his disappearance and continued absence that the court must hold as a matter of law that the presumption of death does not arise; or was it a question for the jury to determine whether or not his absence was 'unexplained'? The cases are in conflict on this question."

In the Axen case we quite fully reviewed the various authorities upon this question, and we will do no more than refer to them here as a further review is unnecessary. That case was an action on the life insurance policy of John J. Axen payable to the appellee. The insured there was cashier of a bank when he disappeared. At that time

he was a married man and was attached to his home and child. At the time of the disappearance he had misappropriated over $30,000 of the bank's funds. None of his family or immediate relatives or friends heard anything from him since the day of his disappearance. In that case we said:

"We think it was a proper question for the jury to determine whether reasonable diligence has been shown, to locate the insured, and also whether his absence for seven years was so explained as to warrant the presumption of his death. We do not think that upon the entire record we can say as a matter of law that the presumption of death could not be indulged. All the facts and circumstances were before the jury, and it was for them to determine whether or not the circumstances under which the insured absented himself prevented the presumption of death from arising or overcame such presumption. The fact that a contrary verdict under a given state of facts would seem more consistent does not of itself justify this court in setting aside the verdict. This is especially true where, as in this case, under the peculiar facts, the conclusions rest on inference and presumptions to be drawn from the evidence."

In the case at bar evidence was introduced tending to show efforts made by the insured's family to locate the absentee. The last word heard from him at his home town was a letter written to the bank showing that he was in New Orleans on February 9, 1921, and admitting his defalcations of $10,000 from the bank in which he was cashier. In that letter he said he was on his way to Central America. No further communications were received by his family thereafter. On inquiry from his mother who was living in Denmark, his wife learned that she had received only one letter from her son, and had no knowledge of his whereabouts except that he said he went to South America; and that she would hear from him when he secured a position.

The plaintiff also inquired from his friends and the persons most likely to hear from him. She also had her attorney make an investigation but without avail. The last information they received was that he had gone to Central or South America but what part of South America was never disclosed. His mother wrote plaintiff she did not know of his whereabouts except that he had gone to South America.

The insured was strongly attached to his family; at the time he

left he was not in good health and had lost about twenty-five pounds. In his letter to the president of the bank he said: "Whenever I think of my family—My God it's enough to make any man crazy—and if it had not been for my family I would have made a clean breast of it long ago and taken my punishment". From the contents of the letters received from his mother and from the other evidence introduced showing that he had written his mother for money, it might be concluded that the only letter she received was the one requesting money, and in which he said he had gone to South America.

We believe that under the facts in this case a jury question was presented. We cannot say, as a matter of law, under the record in this case, that there was not sufficient evidence to make out a prima facie case. All the facts were before the court, and its finding of fact thereon had the same effect as a finding by the jury. It may be that this court or a jury might reach a different conclusion from the same facts offered, but on the whole record we do not feel justified in disturbing the finding of the trial court.

As we said in the Axen case:

"This is especially true where, as in this case, under the peculiar facts, the conclusions rest on inference and presumptions to be drawn from the evidence."

We find no error in the judgment, and the same is therefore hereby affirmed.

KINDIG, C. J., and STEVENS, ALBERT, and ANDERSON, JJ., concur.