JOHN E. WESTCOTT, Administrator, Appellant, v. WATERLOO, CEDAR FALLS & NORTHERN RY. CO., Appellee.

EVIDENCE: Res Gestae—Test—Instinctiveness—Coincidence in
1  Time—Premeditation and Fabrication. The test whether declarations are *res gestae* is: Were the facts talking through the party, or the party talking about the facts? Instinctiveness—spontaneity is the ever present requisite. Precise coincidence in point of time is not necessarily requisite; but opportunity to premeditate and fabricate, by reason of the passing of time and attending circumstances, is fatal, unless it appear *affirmatively* that, notwithstanding the lapse of time and the opportunity to premeditate and fabricate, the declarations were, in fact, the instinctive, spontaneous utterance of the mind, influenced only by the transaction

as it actually occurred. *Held*, certain offered statements were not part of the *res gestae*.

PRINCIPLE APPLIED: Deceased, at 7:30 A. M., was rendered unconscious in a collision with a street car. He was immediately taken to the hospital, arriving there five minutes after the accident. He was at once placed on the operating table and soon regained full consciousness, even recognizing the doctor's voice in an adjoining room and calling to him. He complained of pain and asked that pillows be placed under his limbs to rest them, and talked about different matters and little things regarding his position. Forty-five minutes after arriving at the hospital, he was given an anaesthetic and remained unconscious under its influence during a thirty-minute operation, and until after he was removed to his sick room. After regaining consciousness, and before the anaesthetic was administered, he said: "It- is my fault. I tried to get ahead of the car. I tried to beat the car. I thought I could beat the car." The father of deceased first saw the deceased "between 9 and 10 o'clock A. M." after he had been taken from the operating room. He was still unconscious, and remained so for some five minutes after the father arrived. The father was asked this question: "What, if anything, did he (deceased) say when he regained consciousness, with reference to the injury and how he was injured?" *Held*, properly excluded, as not calling for any part of the *res gestae*.

**RAILROADS: Crossing Accidents—Contributory Negligence.** When the facts and circumstances point so decisively to negligence that the minds of all reasonable men must unite in the conclusion that the deceased was lacking in due care for his own safety, the court will withdraw the question of negligence from the jury and direct a verdict for defendant. *Held*, contributory negligence appeared, and verdict was properly directed accordingly.

PRINCIPLE APPLIED: Deceased, on a motor cycle, was going south, close to the curb on the west side of a street, at a speed of 12 to 15 miles an hour. He knew the first cross street ahead was occupied by street car tracks. He did not slacken his speed as he approached the street car tracks, nor look for cars until within about 19 feet of the tracks. He did not change his crouching position on his machine nor slacken his speed after seeing the car, which was just then close to or entering the west side of the street on which he was traveling. The street car could not then be stopped. Deceased veered to the southeast, and hit the forward trucks of the car. *Held*, verdict properly directed for defendant, because the record affirmatively showed contributory negligence.

**NEGLIGENCE: Contributory Negligence—Sudden Peril Resulting From Negligence.** One cannot excuse his conduct, which other-

wise involves him in negligence, by the plea that he was confronted with a sudden peril manifestly born of his own negligence.

*Appeal from Blackhawk District Court.*—FRANKLIN C. PLATT, Judge.

SATURDAY, DECEMBER 18, 1915.

ACTION to recover for personal injuries. Verdict for the defendant. Plaintiff appeals. *Affirmed.*

*Reed & Tuthill,* for appellant.

*Pickett & Swisher,* for appellee.

GAYNOR, J.—In the city of Waterloo, Mulberry Street runs practically east and west. Second Street runs north and south and intersects Mulberry Street at right angles. One of defendant's lines in the city is laid on Mulberry Street and runs over and across Second Street. The line on Mulberry Street extends a number of blocks east and west of Second Street, on Mulberry Street. On the 3d day of June, 1912, the defendant was operating one of its cars on Mulberry Street and proceeding eastward towards Second Street. Plaintiff's intestate, Earl Westcott, on the same morning, was riding a motor cycle on Second Street, proceeding southward towards the tracks of defendant company. At the intersection of these two streets, a collision occurred between the deceased and the defendant's car, out of which collision the deceased arose with severe injuries, from which he died on the 17th day of September, 1912. His administrator brings this action to recover damages for the injuries thus sustained, and bases his right to recover upon the allegation that the defendant was at the time operating its car at a high and dangerous rate of speed, without sounding any gong or giving warning of any kind of its approach, and in that it failed to slow down and stop the car when danger to young Westcott became apparent, or, in the exercise of reasonable caution, should have become apparent. The defendant tendered issue by a general denial. At the conclusion of all the testimony,

the court, on motion of the defendant, directed a verdict in its favor. Judgment being entered upon the verdict, plaintiff appeals.

Two errors are assigned for our consideration: (1) That the court erred in sustaining the motion to direct a verdict on the record made; (2) that, in the making of the record, the court erred in excluding certain testimony offered by the plaintiff.

We will consider the alleged errors in the reverse order of the assignment. Under the second assignment, it is claimed that the court erred in rejecting testimony offered by the plaintiff, tending to show certain statements made by the deceased, after the injury, which, it is claimed, were of the *res gestæ*.

1. EVIDENCE: *res gestae*: test: instinctiveness: coincidence in time: premeditation and fabrication.

Before coming to the real matter around which this complaint centers, it is necessary that we state somewhat of the record, as it was preceding the offer of the rejected testimony. The collision in which Earl Westcott received his injuries occurred at 7:30 in the morning. He was unconscious when he was picked up. He was taken immediately to a hospital; remained unconscious until he reached the hospital. About five minutes elapsed between the time he was placed in the ambulance and his arrival at the hospital. Upon reaching the hospital, he was immediately placed upon the operating table. Soon thereafter, he recovered consciousness, and talked with the doctors and nurses attending him. Shirley Parker, one of the nurses, testified that she assisted in taking care of him, and was in the operating room ten or fifteen minutes before Dr. Alford came in.

"He was conscious when I saw him. The anæsthetic was administered about three-quarters of an hour after he was brought into the operating room. After the anæsthetic, he did not recover consciousness until he was removed from the operating room to his room."

Lyda Ellis testified that she, also, was one of the nurses;

that she saw him after he was brought into the operating room, assisted about the operation and in the care of the boy; that, when she first saw him, he was conscious; that she remained in the operating room during all the time the boy was there, which was about forty-five minutes.

Dr. Alford testified that he was present and assisted in the operation; that young Westcott was under the anæsthetic about thirty minutes and was then taken to his room; that he was unconscious from the time the anæsthetic was administered until he was taken out of the operating room.

Each of these witnesses testified that after he was brought into the hospital and placed on the operating table and before the anæsthetic was administered, he was perfectly conscious, and talked rationally; that he recognized Dr. Alford's voice before he came into the room, and called him; complained of being in pain and asked that pillows be placed under his limbs to rest them; talked a great deal about different matters and little things, in regard to his position, etc.

Each of these witnesses further testified that, upon recovering consciousness and before the anæsthetic was administered, he said, in speaking of his injuries and how they were brought about: "It is my fault. I tried to get ahead of the car. I tried to beat the car. I thought I could beat the car."

Lyda Ellis further testified: "Dr. Alford was called in. The boy called him. He heard Dr. Alford talking in the other room, recognized his voice and called him in. I remember hearing him (Earl Westcott) say, 'It is my fault. I tried to get ahead of the car.' He did not state how he tried to get ahead of the car. Just how long it was before the anæsthetic was given after he came into the room, I cannot say. I wouldn't say it was forty-five minutes,—probably not as long as that."

Dr. Alford testified that it was thirty minutes after he saw him before the anæsthetic was administered.

These witnesses were all called by the plaintiff and testified in plaintiff's behalf. Thereupon, the plaintiff called the deceased's father, John E. Westcott, who testified:

"When I reached the hospital, Earl was in the operating room. He was then taken out of the operating room to his room. I saw him for the first time after he had been taken to his room. He was then unconscious. At that time, I did not know an anæsthetic had been given to him, but have since learned that it was. I do not know what his condition was from the time he reached the hospital up to the time he received the anæsthetic. I was not there during that interval. I first saw him in his room between 9:00 and 10:00 o'clock. He remained unconscious for about five minutes, though it seemed longer. I was standing by his bedside after he recovered consciousness from the anæsthetic. He was unconscious when I first went in the room. He was suffering pain after he came out from the anæsthetic."

He was then asked this question: "What, if anything, did he say when he regained consciousness, with reference to the injury and how he was injured?"

This question was objected to, and objection sustained.

Thereupon, the plaintiff made the following offer in writing:

"Plaintiff offers to prove, by the witness John E. Westcott, that plaintiff's intestate then said: 'I wasn't riding fast. I was coming down Second Street ten or twelve miles an hour; did not hear any bell. If they had rung the bell, they wouldn't have got me. Heard a rumble as I came down Second Street. Looked down the street toward town where the cars usually come from; saw no car. Looked in opposite direction, and the car was almost upon me. I done the best I could. I turned with the car and done the best I could to get out of the way.' "

This was objected to and objection sustained, and upon this ruling, error is predicated.

This evidence is clearly hearsay and in the nature of a

self-serving declaration, and is not admissible, unless it comes
under the exception to hearsay testimony which allows such
testimony as a part of the *res gestæ*. The declaration or
statement, to be a part of the *res gestæ*, must be the expres-
sion of a thought born in the mind as a result of natural
and legitimate commerce with the act itself, concerning which
.the expression is made. It must be the instinctive expression
of the mind, prompted and uttered as the natural and proxi-
mate result of the operation of the act upon the mind itself.
To be a part of the *res gestæ*, the declaration must be the
instinctive expression of the mind's conception of the act,
the conception being the legitimate, natural and usual opera-
tion of the act itself upon the mind. Though time is held
not to be controlling, yet, the shorter the time,—the shorter
the interval between the time of conception and birth,—the
more certain it is that the thought expressed is the legiti-
.mate offspring of the act itself.

In the case at bar, the catastrophe produced in Earl
physical conditions. These conditions of the body, operating
upon the mind, naturally found expression immediately upon
. recovering consciousness. The cause and the condition in
which he found himself were intimately and closely associated
with each other, one dependent on the other. When he first
recovered consciousness, what he said could be well treated
as an expression of the act speaking through the mind of
him who had suffered from the act, and was so treated and
received by the court. After reaching the hospital, he re-
mained conscious for at least half an hour, spoke freely of
his condition and of the cause of his condition. He was
then placed under an anæsthetic and operated upon, and
did not recover consciousness from the anæsthetic until re-
moved to his private room. He was unconscious when he
reached the room. When he recovered consciousness, his
father and mother were there by his bedside, no doubt with
tearstained faces; at least with faces expressive of anxiety and
grief. The declarations offered were made between two and

two and one-half hours after the accident. It made, they were made to his father and mother, while so standing by his bedside. He was a boy, who, no doubt, was conscious of the love and pity of the parents by his side. Whether he spoke in answer to questions propounded to him or volunteered the information offered, does not appear. This is certain: he was removed both by time and place from immediate contact with the cause of his injury. There were new conditions confronting him and new surroundings. These are not controlling, but are worthy of consideration. The further removed in point of time from the *res gestæ*, the more uncertain it becomes that the expressions made are the legitimate offspring of the *res gestæ*. The evidence offered is hearsay and self-serving. To be admitted, it must come clearly within the exception. Though time and opportunity to fabricate are not always controlling, yet the courts jealously guard against the possibility of premeditation and design which time and opportunity to fabricate afford; and so it is held that it must appear that the declarations or statements offered are the natural and spontaneous utterances of the party, produced and brought about by the operation of the *res gestæ* upon the mind, and must relate to immediate and present events, and must not be a recitation or narrative of past transactions, called into existence in the mind by the effort of recollection or memory. The declaration offered must be such as the declarant would be competent to give upon the witness stand, and such as, when given, would be competent evidence in the cause. Mere opinion, therefore, as to what might or might not have happened, is not competent evidence.

In *Keyes v. City of Cedar Falls*, 107 Iowa, 509, it is said:

"It is often difficult to determine when a statement or declaration is a part of the *res gestæ*. The rule . . . is, that, if they are near enough in point of time with the principal transaction to clearly appear to be spontaneous and unpremeditated and free from sinister motives, and afford a

reliable explanation of the principal transaction, they are admissible in evidence."

See also *Alsever v. Minneapolis & St. L. R. Co.,* 115 Iowa 338; *Clark v. Van Vleck,* 135 Iowa, 194; *Dubois v. Luthmers,* 147 Iowa, 315; *Rothrock v. Cedar Rapids,* 128 Iowa, 252.

It is apparent from the authorities that, where the declaration accompanies the act done, and is apparently an expression prompted by the operation of the act upon the mind of the person, and characterizes or explains the act, its competency is easy of determination; but when it is removed from the original act by the lapse of time, and is not the immediate, spontaneous product of the occurrence itself, more difficulty arises. The conditions then must be such as make it appear that, notwitstanding the lapse of time, the expression was, in fact, produced by the immediate operation of the *res gestæ* upon the mind of the declarant. So jealous is the law of the truth, and so essential is the truth to the correct administration of the law, that the gateways through which it enters are jealously guarded against the possibility of error's entering, no matter in what disguise she appears.

The rule admitting declarations as a part of the *res gestæ,* as originally formulated and followed, required that the declaration be contemporaneous in point of time with the act concerning which the declaration was made. This limitation is exemplified in *Regina v. Bedingfield,* 14 Cox C. C., 341. In this case, the defendant was indicted for murder. The Crown, after showing that the deceased had been in the house with the accused party, undertook to show that, in a minute or two, deceased rushed out with her throat cut, said something and died. The Crown undertook to show what she said at that time, and the statement was held not to be a part of the *res gestæ,* the court saying that it was not a part of the thing done, or something said while something was being done, but something said after something done.

The doctrine has not been as closely applied in this country, and it is not required that the declaration be con-

temporaneous with the act; but all courts hold that it must be spontaneous, and not a narrative of past events. It must appear that the interval of time did not afford an opportunity to premeditate and fabricate. If the interval of time, with the circumstances attending, indicates that there was an opportunity to premeditate, and, by premeditation, to fabricate a story, the courts will reject it, without inquiring as to whether the intervening time did, in fact, result in premeditation and fabrication.

In *Fish v. Illinois Cent. R. Co.*, 96 Iowa, 702, 707, this court said: ''The law recognizes things said and done so soon after the act complained of as to be, in effect, a part of it, as of the *res gestæ*, and, applying the rule to declarations, if they are within such time as that premeditation is precluded, they may be regarded as a part of the thing done.''

In the case at bar, the declaration offered, being of a self-serving character, ought not to be received unless it affirmatively appears to be a part of the *res gestæ*. If time for premeditation, time for reflection, has passed before the declaration is made, which gives opportunity for fabrication, the court will reject it unless it affirmatively appears that, notwithstanding the time and the opportunity, the declaration was, in fact, the instinctive and spontaneous utterance of the mind, influenced only by the transaction as it actually occurred. The general rule, as laid down in the *Keyes* case, *supra*, is that, ''If they are near enough in point of time with the principal transaction to clearly appear to be spontaneous and unpremeditated and free from sinister motives, and afford a reliable explanation of the principal transaction, they are admissible in evidence;'' otherwise not.

The difficulty lies, not in ascertaining the rule, so much as in its application to particular facts, and each case, therefore, must be judged largely by its own peculiar facts; and this is essentially true when the declaration or statement is not contemporaneous with the transaction. Applying these

rules to the instant case, we must hold that the court did not err. in rejecting this testimony.

The thought first spoken after recovering consciousness from the shock of .contact with the car, as hereinbefore narrated and introduced by the plaintiff as a part of the *res gestæ*, and received by the court as such, must be accepted as the correct explanation of deceased's understanding as to how the accident occurred. A statement subsequently made which contradicts the first cannot be a part of the *res gestæ;* for both cannot be the natural and spontaneous utterance of thoughts created by or springing out of the transaction itself.

This brings us to a consideration of the first assignment of error: Did the court err in sustaining defendant's motion for a directed verdict upon the record as made? No good purpose would be served by reviewing the evidence upon this question. Suffice it to say that we have examined this evidence with care, and find that the deceased was proceeding southward on Second Street, close to the curbing on the west side, riding on a motor cycle, riding at a speed variously estimated at from twelve to fifteen miles an hour. He knew that defendant's tracks were on Mulberry Street; knew that he must cross Mulberry Street if he would proceed farther south on Second Street. He did not slacken his speed as he approached this street on which the cars were operated; did not turn to look until he had reached the north line of Mulberry Street; then looked to the east and west and turned suddenly to the east; ran in front of the car and was run down and injured.

2. RAILROADS: crossing accidents: contributory negligence.

The street between curb lines is 40 feet wide. The railway tracks are 4 feet 8 inches in width. The cars extend some distance over the rails, so that the curbing is approximately 16 or 17 feet from the car. From the curb to the inside walk lines is 19 feet. When he discovered the car, he turned abruptly to the east, and collided with the car at a

point opposite the front trucks. Defendant's car, if not at, was very close to, Second Street when the deceased first looked up. He did not slacken his speed or change his crouching position on the motor cycle. Nothing that defendant could have done, after discovering his position, could have avoided the collision.

The plaintiff has not only failed to show freedom from contributory negligence, but we think that the record affirmatively shows such contributory negligence on the part of deceased, such want of care for his own safety, as precludes recovery in this case. This was the ground upon which the court directed a verdict. One cannot excuse his conduct, which otherwise involves him in negligence, by the plea that he was confronted with a sudden peril, when it is apparent that the peril that confronted him was one to the creation of which he contributed, by his own negligence. As bearing upon this case, see *Ames v. Waterloo & Cedar Falls R. Co.*, 120 Iowa, 640, and cases therein cited.

3. NEGLIGENCE: contributory negligence: sudden peril resulting from negligence.

We find no error in the record, and the cause is— *Affirmed.*

DEEMER, C. J., LADD and SALINGER, JJ., concur.