CHARLES PETERSON, Administrator, Appellee, v. PHILLIPS COAL COMPANY, Appellant.

**TRIAL:  Reception of Evidence—Order of Proof—Discretion of Court.**
1  Testimony on the main case may be properly received after argument on motion for directed verdict.

**EVIDENCE:  Res Gestae—Instinctiveness—Coincidence in Time.**  On
2  the question whether certain matter is *res gestae*, the all-important requisite is *instinctiveness*, not necessarily precise coincidence in point of time.

  PRINCIPLE APPLIED:  In some manner, a miner got beneath his car and was severely injured.  On a cry for help, several miners went at once to his assistance, and he was taken from under the car, placed in an empty car, and driven to the mouth of the mine.

The injured man was conscious, but suffering great pain. From 3 to 10 minutes after the arrival of help, he said: ''The mule hit the door frame with his hips and withers and was stumbling all the way down the hill.'' *Held, res gestae.*

**MASTER AND SERVANT:** Negligence of Master—Injury—Causal
3  Connection.  No causal connection between negligence proven and injury suffered, no recovery.

PRINCIPLE APPLIED: Personal injury action. The negligence alleged and, *arguendo*, assumed to be proven, was ''that the door to an entry in a mine through which deceased passed was not high enough to permit the mule driven by deceased to pass without striking his withers.'' Deceased, riding on his car, was seen to pass through the door. After passing through the door, his car would, for 30 feet, pass slightly upgrade, and thence gradually downward for 180 feet. After passing the door, deceased was heard to cry for help. He was found under the car, *210 feet from said door*. While being removed from the mine, he said: ''The mule hit the door frame with his hips and withers and stumbled all the way down the hill.'' *Held*, causal connection between negligence alleged and injury was wholly lacking.

**NEW TRIAL:**  Grounds—Odor of Untruthfulness in Record.  An un-
4  avoidable odor of untruthfulness surrounding testimony which manifestly is the *sole* support for a verdict, may be sufficient to demand the *granting* of a new trial and may even justify the appellate court in overturning the action of the lower court in *refusing* a new trial; and this, too, while giving recognition to the rule that the credibility of witnesses and the weight of their testimony is for the jury. So *held*, under exceptional circumstances, where the belated testimony of a single witness, impeached by his own former signed statements and persuasively discredited by the attendant circumstances, supplied, in a personal injury action, the only possible causal connection between the negligence alleged and the injury suffered.

*Appeal from Wapello District Court.*—C. W. VERMILION,
Judge.

WEDNESDAY, APRIL 5, 1916.

ACTION at law to recover damages on account of the death of plaintiff's intestate, alleged to have been caused by the defendant's negligence. Judgment for plaintiff, and defendant appeals.—*Reversed.*

*Parker, Parrish & Miller* and *C. Woodbridge,* for appellant.

*J. A. Lowenburg* and *W. S. Asbury,* for appellees.

WEAVER, J.—At the time in question, the defendant was operating a coal mine in Wapello County, and the deceased, Edwin Peterson, was employed therein as a mule driver. At the time of the accident in controversy, he was driving in what is termed the south back entry. His route led through a door constructed between the seventh and eighth entries. On his last trip, he was seen to mount the tail chain in the position usually taken by drivers and start with a loaded car along the entry in the direction of the door above mentioned. He was also seen as he passed through the door. According to an engineer's measurements, the track in the direction deceased was moving was slightly upgrade from the door for about 30 feet, thence a gradual downward slope for about 180 feet to a low point or level, called by the miners a swamp. The total descent is said by the engineer to be less than five feet, though the estimate by some of the witnesses is considerably greater. The entry appears to have been low in places, and the way through it had been narrowed by piling "gob" on either side, leaving in places barely room for hauling cars along the track. Deceased had not been hauling on this particular route for more than a day or two; but he was a driver of several months' experience, and we may fairly assume that he had acquired a reasonably adequate knowledge of the general character and nature of the entry. After he had driven through the door on this last occasion and passed on down the slope, one of the door tenders in the mine heard him cry out or call for help, and responding thereto, the boy went to his assistance, and found him caught or fastened in some way under the car. Whether the car was derailed or was still upon the track is a subject of difference in the recollection of the witnesses. The boss driver, one Murphy, was

near at hand, and, on arriving at the scene of the accident, summoned another driver, Brown, and about the time deceased had been taken from under the car, his brother, Ainer Peterson, arrived. The unfortunate young man was then lifted into an empty car, where he was supported by his brother and Murphy. Brown drove the car to the shaft, whence deceased was taken to the home of his father near at hand, where he died.

The petition in the case charged the defendant with negligence in eight specified particulars: (1) Defective construction of the entry, whereby the passage was too low to afford safe passage; (2) making the entry too narrow and permitting the passage to be further narrowed by piling refuse therein; (3) failing to provide light or other warning in the swamp; (4) defective construction and maintenance of the car tracks; (5) faulty construction of the door between the seventh and eighth entries; (6) failing to furnish deceased a safe place to work; (7) furnishing deceased with an unsafe or vicious mule with which to do the hauling; and (8) transferring deceased from a safe part of the mine to one which was dangerous without giving him proper warning of the risk so occasioned.

At the close of the testimony, the court narrowed the issues by charging the jury as follows:

"The only claim of negligence submitted for your consideration is the allegation that the door in question was not high enough to permit the mule driven by deceased to pass without striking his withers;" and the charge to the jury as a whole was framed upon the theory indicated by the order or direction above quoted. There was a verdict for plaintiff for $5,500, and, defendant's motion for a new trial having been denied, judgment was entered accordingly.

We do not find any allegation in the petition that the door was not high enough to permit the mule driven by deceased to pass without striking his withers. It is possible, however, that, in the absence of any motion for more specific

statement, the general allegation of "faulty construction of the door" may be considered sufficient to permit the introduction of evidence of the nature indicated by the court; and for the purposes of this appeal, we shall so treat it. The evidence on which plaintiff relies in this respect is as follows: It is shown that the mule driven by deceased was somewhat larger and taller than the average of those used in this work, and was difficult to manage. Some of those who describe it from memory and casual observation only, estimate its height at the withers at 60 inches or more. The height of the door opening as stated by the witnesses, many of whom speak only as a matter of estimate without measurement, varies all the way from 52 to 60 inches. Witnesses for the defense, speaking from alleged actual measurements, say that the height of the mule was 57 inches, and of the door, 60 to 61 inches. The boy who attended the door and was present on each occasion when deceased drove through says he never saw any indication of trouble or difficulty in the passing of the mule through the opening. No living witness undertakes to say that, in the actual use of the door, the mule was ever seen or known to strike the frame, either overhead or at the side. Nor is any living witness produced who is able to point to any connection whatever between the alleged insufficiency of the door opening and the disaster to the deceased at a point more than 200 feet distant therefrom. The needed connection between such alleged cause and effect is sought to be supplied as follows. It will be remembered that the witnesses Brown, Murphy and Ainer Peterson placed deceased in an empty car and carried him to the shaft, Brown driving the car. Ainer Peterson held or supported him in his arms. On the trial, the witnesses named testified to this circumstance in considerable detail. When plaintiff had rested his case, defendant moved for a directed verdict upon the ground of failure of evidence to establish the plaintiff's allegation of negligence or any proximate connection between the alleged negligence and the injury of deceased. When the motion had been argued, and before

ruling thereon, the court, over defendant's objection, per-
mitted plaintiff to recall the witness Brown, who testified for
the first time that, while he and Ainer Peterson and Murphy.
were taking deceased from the place of his injury to the
shaft, deceased made the statement that "the mule hit the
door frame with his hips and withers and was stumbling all
the way down the hill." On the strength of the record as
thus amended and perfected, the court denied the motion to
direct a verdict, and the trial proceeded to verdict and judg-
ment for the plaintiff.

I. The point is made that, as a matter of proper prac-
tice, the court erred in permitting the recall of the witness
Brown after plaintiff had once rested and after motion to
direct had been submitted. The exception is
not well taken. The court presiding at the
trial is in position to see whether the party
asking such privilege is acting in good faith
and whether the granting thereof is likely
to put his adversary at an unfair disadvantage; and, unless
there is a clear case of abuse of discretion, we cannot right-
fully interfere therewith. The first purpose of all litigation
is to ascertain the very truth of the controversy, and if that
purpose is not defeated by a departure from the usual order
for the introduction of evidence, the error, if any, will be
held to be without prejudice. No mere strategic advantage
which enables either party to shut out material and competent
evidence ought to be recognized by the court in the absence of
some imperative rule requiring it.

1. TRIAL: recep-
tion of evi-
dence: order
of proof: dis-
cretion of
court.

II. It is argued with much earnestness that the statement
which Brown ascribes to the deceased was not a part of the
*res gestae*, and should have been excluded on that ground.
The time which elapsed from the arrival of
help until the statement was made was vari-
ously estimated at from 3 to 10 minutes.
The deceased, though conscious, was still suf-
fering greatly from his injuries; and the succession of inci-

2. EVIDENCE: *res
gestae*: instinc-
tiveness: coin-
cidence in time.

dents, his injury, his outcry, the appearance of help, his release from under the car, his removal toward the shaft and the alleged statement, followed in such quick moving order that we think the matter comes within the rule which admits testimony of statements of an injured party made "in such intimate connection with the event in issue as to make it, in a proper and reasonable sense, a part thereof." The rule concerning the admissibility of such statements as *res gestae* is one upon which the courts have widely differed, not so much upon its abstract statement as upon the degree of strictness or liberality with which it is applied. . Some authorities hold quite literally to the proposition that the words offered in evidence must have been spoken at the very time or concurrently with the event, while others hold that the principle extends also to other statements or exclamations made under circumstances indicating that they are the spontaneous utterance of thoughts created by or springing out of the event itself, and so soon thereafter as to exclude the presumption or inference that they are the result of premeditation or design. *International & G. N. R. Co. v. Anderson,* 82 Tex. 516; *Commonwealth v. M'Pike,* 3 Cush. (Mass.) 181. The Supreme Court of the United States, speaking of the proper scope of the rule, says, "generally the declarations must be contemporaneous with the main fact to which they relate. But this rule is by no means of universal application." *Insurance Co. v. Mosley,* 8 Wall. 397. See also *Delaware, L. & W. R. Co. v. Ashley,* 67 Fed. 209, 213; *Augusta Factory v. Barnes,* 72 Ga. 217, 227; *Harriman v. Stowe,* 57 Mo. 93, 96; *Armil v. Chicago, B. & Q. R. Co.,* 70 Iowa 130, 132; *Waldele v. New York Cent. & H. R. R. Co.,* 29 Hun. (N. Y.) 35; *Keyes v. Cedar Falls,* 107 Iowa 509; *Rothrock v. Cedar Rapids,* 128 Iowa 252; *Spevack v. Coaldale Fuel Co.,* 152 Iowa 90. In the *Mosley* case, above cited from the Supreme Court of the United States, the court says of the *res gestae* rule:

"The tendency of recent adjudications is to extend rather than to narrow the scope of the doctrine. Rightly guarded in

its practical application, there is no principle in the law of evidence more safe in its results.''

See also to same effect *State v. Harris,* 45 La. Ann. 842, 844. That this court adheres to the broader construction of the rule is readily seen in the precedents above cited. The objection to the evidence as not being *res gestae,* assuming the evidence to have been otherwise competent, was properly overruled.

III.   A more serious question arises when we come to consider whether, upon the entire record, including the testimony of Brown, plaintiff made a case upon which the finding of the jury can be maintained. It should be kept in mind that the trial court withdrew from the jury all of the various charges of negligence except the single one concerning the insufficiency of the doorway; and that, unless there was evidence fairly tending to establish the fact · of such alleged insufficiency and the further fact that such defective condition was the proximate cause of the injury to the deceased, no recovery can be had. Without Brown's testimony, there is, as we have already intimated, not the slightest evidence to show the relation of cause and effect between the condition of the door or doorway and the fatal injury of the deceased 210 feet distant therefrom. Does his story supply the needed connection? We think not. If the injured man made the statement, it nowhere appears that he made it as an explanation of the way in which he received his hurt. The words which Brown places in his mouth were spoken, if at all, after he had been lifted into the empty car and was 250 feet on his way to the shaft, and Brown himself says they were not spoken in answer to any inquiry concerning the cause of the accident. So all we have is the isolated statement of the young man, not called out by or relevant to any inquiry made of him, that the mule hit the door and stumbled all the way down the hill. There is nothing in the statement to convey the idea, unless it be by mere remote inference, that the alleged

3. MASTER AND SERVANT: negligence of master: injury: causal connection.

contact between the animal and the door frame was the cause
of the animal's stumbling all the way down the hill.  The hill,
or descending grade, was not reached until he had passed 30
feet beyond the door; and even if the mule stumbled in making
the descent from that point, it requires a fertile imagination
to trace the cause of the mule's uncertain footing back to the
fact that his withers and hips scraped the door frame as he
passed through.  Neither is there in the statement any asser-
tion or claim that by the stumbling of the mule deceased was
thrown from the car and under the wheels; or, if it may be
said that such is the reasonable inference, there is still lacking
any showing of any causal connection between such mishap
and the condition of the door.  If the record disclosed any
other evidence tending in any degree to sustain the affirmative
of the single issue submitted to the jury, it might well be
that the testimony of Brown would have been of some value
as tending to corroborate it; but standing alone, as it does,
without corroboration or support, it is wholly insufficient to
sustain the verdict.  We come to this conclusion the more
readily in view of the atmosphere of doubt which surrounds
this particular item of evidence.

　　We concede that the credibility of the witness and the
weight and value of his testimony are matters for the jury
alone; but on a motion for a new trial, if an examination of
the record discloses that the verdict is explain-
4. NEW TRIAL: able only on the theory that the jury gave
grounds: odor
of untruthful- credence to testimony which is enveloped in
ness in record.
grave doubt or uncertainty which no amount
of judicial charity can ignore, it is within the authority of the
court in the interest of substantial justice to sustain the
motion.

　　"The function of the court with reference to evidence is
not fully and completely discharged when it determines the
admissibility of evidence offered.  It may still look into the
whole case to see whether the items of evidence together con-
stitute any substantial proof of the fact sought to be estab-

lished." *Brooks v. Brotherhood of Am. Yeomen,* 115 Iowa 588.

It is true that this rule has special reference to the functions of the trial court; but it is an accepted proposition that this court will more readily interfere with the discretion of the trial court where a new trial is denied than where it is granted, and in a clear case where manifest injustice will be done by permitting a verdict to stand we do not hesitate to reverse a judgment entered thereon. *Cottage Organ Co. v. Caldwell,* 94 Iowa 584; *Turley v. Griffin,* 106 Iowa 161; *Snyder v. Thompson,* 134 Iowa 725. That the present case calls for an application of this rule, we have no doubt. So far as the record discloses, the witnesses Leach, Murphy, Brown and Ainer Peterson were the only persons having any opportunity to hear what the deceased said when he was discovered in his injured condition or while he was being removed from the mine. Of these, Leach, the first to arrive, testifies that, while still at the place of accident and before being placed in the car for removal, deceased said that his "light went out and the mule slowed up and squeezed him when his light went out," and that he hung on as long as he could. Murphy, the next to arrive, testifies that, in answer to his inquiry as to how it happened, deceased said, "I guess it got dark and in reaching for the butt-stick I fell." The witness further adds, "He said his lamp had went out." The significance, if true, of this evidence that deceased said his light went out and the mule slowed up and squeezed him, is shown by other evidence that it is characteristic of a mule employed in driving through dark mine entries that it will stop suddenly if the driver's light goes out; and it is manifest that if such stop is made unexpectedly, the driver, standing on the tail chain, is liable to be caught and squeezed between the moving car and the rump of the mule. Ainer Peterson, brother of the deceased, was last to arrive, and he says nothing of hearing the statements spoken of by Leach and Murphy. Of the three men getting into the car to take deceased to the shaft, Brown, the driver, alone testifies to the alleged statement about the mule's

hitting the door frame and afterwards stumbling down the hill. Murphy, who was assisting in supporting the man, denies that any such thing was said; and strangely enough, the brother, who held the injured man in his arms, is silent on the subject, and plaintiff's counsel do not interrogate him concerning it. Brown himself did not testify to it until recalled after the plaintiff had once rested, and it is shown that, at the coroner's inquest, he signed a statement of his testimony there given to the effect that deceased, when being taken from under the car, stated that his "carbide lamp was the cause of the accident," and that that was all he said in regard to how it happened. In this statement, no mention was made of the language which Brown now attributes to the deceased on the way to the shaft. Moreover, upon cross-examination upon the subject, his answers are uncertain and unsatisfactory, and the frequency with which he takes refuge behind the response "I don't remember" and "I didn't hear it" is not reassuring of his entire reliability.

Without further prolonging the opinion, we hold that the motion for new trial should have been sustained, and the judgment appealed from is therefore reversed, and cause remanded for a new trial in harmony with this opinion.— *Reversed* and *Remanded.*

EVANS, C. J., DEEMER and PRESTON, JJ., concur.