ANNICE STUKAS, Administratrix, Appellee, v. WARFIELD-PRATT-HOWELL COMPANY, Appellant.

**EVIDENCE:** Res Gestae—Test for Admission. The test whether
1 declarations are *res gestae* is: Were the facts talking through the party, or the party talking about the facts? Instinctiveness —spontaneity—is the ever-present requisite. Precise coincidence in point of time is not necessarily requisite.

**TRIAL:** Conflicting Res Gestae—Effect. Evidence which is part
2 of the *res gestae* may stand in the record for what it is worth, even though, after its introduction, the opposite party introduces *res gestae* which are prior in time to the first, and inconsistent therewith.

**NEGLIGENCE:** Elevator Accident. Evidence reviewed, and held
3 sufficient to sustain a verdict for negligence in the operation of a freight elevator.

**NEGLIGENCE:** No Eyewitness Rule. Principle recognized that,
4 in the absence of any eyewitness to an accident, the law will presume due care.

*Appeal from. Woodbury District Court.*—J. W. ANDERSON, Judge.

DECEMBER 13, 1919.

REHEARING DENIED MARCH 17, 1920.

ACTION at law to recover damages on account of the death of George Stukas, who was fatally injured in an elevator accident in a building owned by the defendant in Sioux City, Iowa. There was a verdict and judgment for the plaintiff, and defendant appeals.—*Affirmed.*

*C. Woodbridge, E. M. Corbett,* and *Sears & Snyder,* for appellant.

*E. G. Smith* and *Jepson & Struble,* for appellee.

WEAVER, J.—The defendant was the owner and occupant of a six-story building in Sioux City. In this building, defendant installed and was operating two elevators, mainly used for the handling and moving of freight. They were not intended for use as ordinary passenger elevators, but were, in fact, to some extent, used by employees and workmen in passing from one floor to another, in the course of their employment. On October 20, 1917, one Sulzbach, a contractor, was engaged in making extensive changes and repairs in the interior of the building, and among the employees of Sulzbach in that service was George Stukas. The plan of improvements being made in the building required the cutting of openings through the several floors, and this part of the carpenter work was being done or directed by Stukas. He had worked there several weeks, and, with others of the workmen, made frequent use of the elevators, not only to be carried from one floor to another, but for carrying the necessary tools and materials for their use. An employee of the defendant operated the elevator, which was equipped with automatic gates or guards. They were so contrived that, at the basement and the sixth floor, the gates would open at the approach of the elevator and close with its departure. At the intermediate floors, the gates did not automatically open and close, except when it was

1. EVIDENCE: *res gestae:* test for admission.

desired to stop at such floor; and in such case, a pull upon a rope used for that purpose would bring into operation a clutch by which the gate was lifted. If left open, however, all the gates would close automatically, with the downward movement of the cage.

That the deceased was injured in the elevator is not denied. There was no eyewitness of the accident, and no one, so far as is known, saw him enter the elevator, or is able to describe the manner or method of his entrance into the cage. He was seen on the fifth floor, going in the direction of the elevator, very shortly before the outcry following his injury was heard. When the alarm was given, a witness at work near the elevator on the sixth floor ran to the shaft, where he found the cage lifted nearly to the level of that floor. The deceased lay with his face down upon the cage floor, while one of his legs was caught between the "header," or the edge of the opening into the shaft, and the floor of the cage, in such shape as to indicate that he had been lifted from the floor below, and that, in the upward movement of the cage, his leg had been, in some manner, drawn into the narrow space between the elevator and the opening through which it operates, crushing and mangling the limb. Subsequent examination also disclosed extensive injuries to the pelvic bones and internal structure of the lower part of his body. An ambulance was quickly summoned, and the unfortunate man removed to a hospital, where, within a few hours, he died.

The plaintiff, as administrator of his estate, charges that the injury and death of the deceased were the proximate result of the defendant's negligence.

Of the several specifications of negligence, the court submitted to the jury only the plaintiff's allegation that the servants and employees of the defendant carelessly and negligently set the elevator in motion, as deceased was entering or about to enter the cage. The defendant denies

generally the allegations of negligence, and alleges that deceased was well acquainted with the elevator and its construction and management, and assumed the risk of injury received by him in its use. At the close of the evidence, defendant moved for a directed verdict in its favor, because of the insufficiency of the evidence to support a recovery of damages. The motion was denied, and the issues submitted to the jury, which returned a verdict in plaintiff's favor for $5,000, and judgment was entered accordingly. A motion to set aside the judgment and verdict and for a new trial having been overruled, the defendant appeals.

I. Before taking up specifically the points pressed upon our attention in the appellant's argument, it is well to make brief reference to some of the testimony elicited in the trial. For the plaintiff, it is shown that one Hanson, an employee of Sulzbach's, was at work on the sixth floor, about 25 or 30 feet from the elevator, when his attention was attracted by the sound of a fall and a cry from some person, and, running to the elevator, he found it and the injured in the position we have already described; and, with the help of others, the deceased was released from the cage, and very soon removed to the hospital. This witness had seen the deceased on the sixth floor, going in the direction of the stairway, about ten minutes before the accident. The injured man seemed to be conscious, but the witness had no talk with him. The elevator was in frequent use, and was ordinarily in charge of an operator. From the time the witness discovered the deceased in the cage of the elevator until he was removed to the ambulance, about 10 or 15 minutes elapsed. Responding to the call for the ambulance, two witnesses, Hennesy and Meis arrived. Hennesy says it was a "hurry-up call," and they went immediately to the building, and "loaded the man in the ambulance and beat it for the hospital." Describing the condition of the deceased at that time, he says:

"His face was all purple; his eyes were kind of bulged out of his head and real bloodshot. He was conscious. From the time we got the call until we got into the hospital was about 20 minutes. When we got to the hospital, we put him on the elevator, and took him up to the operating room immediately. When we took him out of the ambulance, he said the 'son of a bitch' wouldn't stop the elevator when he hollered. * * * I did not ask him anything about the accident when he said that. I don't know who he was talking about. I am giving just what he said. He did not mention any names. I don't know how he came to make the statement. I did not hear him say anything else. Nobody was asking him any questions or talking to him about the matter at all when he made the statement. I think he was conscious, from the way he talked."

The witness Meis tells substantially the same story. Says that Hennesy and he went quickly, upon receiving the call, and estimates the time from the call until they arrived with the deceased at the hospital at between 15 and 20 minutes, though he says it might have been between 20 and 25 minutes, and might have been less than 20 minutes. He also corroborates Hennesy as to the statement by the deceased that "the 'son of a bitch' wouldn't stop the elevator when he hollered." On cross-examination, he says the only other words he heard spoken by deceased were, as they were taking him up in the elevator at the hospital, he said: "Look out for the elevator, boys. Look out for the elevator." The witness adds, "I cannot say whether he was conscious or unconscious."

While the deceased was being removed from defendant's building, news of his injury was telephoned to his wife, with word that he was being taken to the hospital, where she at once went, arriving, according to her evidence, in not more than 20 minutes. On her arrival, she went at once to the operating room. She swears that her husband

there told her "he had been caught in the elevator;" that he "got his foot caught in the elevator, and he called to the elevator man to stop, and he kept right on. He did not say how he got his foot caught. He said he called to the elevator man to stop, and he was too frightened or did not know enough to stop." The wife also describes the physical appearance of her injured husband substantially as do the other witnesses above mentioned. On cross-examination, the witness says that:

"On three or four occasions, her husband had 'spells,' when he was weak or faint, and on such occasions, he laid down, about half or three quarters of an hour. He was never unconscious. Would lay down, sort of helpless."

A sister of the deceased's, Mrs. Snell, living, at the time, in the same city, who also received a telephone message that Stukas was injured, and being taken to the hospital, testifies that, within 20 minutes, she went to the hospital, and found her brother on the operating table. She says:

"I went up to my brother and laid my hand over his, and said to him, 'I am here, George;' and he said, 'Yes, I know you are here, Irene.' He said he had been hurt in the elevator at Warfield-Pratt-Howell Company's. He said that, as he was getting in the elevator, they started the elevator, and he caught his foot, as he was getting in, and he could not help himself. He said he called to the elevator boy, and said: 'Stop, I am caught.' But he said the boy seemed to be so frightened he could do nothing, and he got off the elevator and left him alone."

It should also be said that the testimony of Hennesy, Meis, Mrs. Snell, and Mrs. Stukas, relating to alleged statements of the deceased concerning the cause and manner of his injury, was all objected to as incompetent, and not admissible as any part of the *res gèstae*.

As the physical condition of the deceased from the

time of his injury until his death, some three or four hours later, had a material bearing upon some features of this case, we also quote from the testimony of the surgeon who attended him. He says:

"Mentally, he was apparently in very good shape. He was very blue from about the middle of his chest up and over his face. He was apparently in extreme shock, and for this reason perhaps was not suffering as much as he otherwise would, because his injuries developed to be of the most serious character. * * * From the blueness over his chest and face, I took it he had been very badly squeez- ed, forcing the air and blood into the upper part of his body,—especially the blood; and small hemorrhages out underneath the skin of the face would indicate that condi- tion. I found very extensive damage to the pelvis and pel- vic bones. The pelvic bones are the large bones to which the thigh is joined; and in this accident, these large bones at the side, ordinarily known as hip bones, had been torn apart. Especially was this true in the front part of the body. It was possible to pass my hand from the place where they were joined onto the trunk up inside of his body, 6 or 8 inches up around his bladder. His rectum was torn through, and the urethra ruptured; and on either side, be- tween the thighs and trunk, one could go up on the inside of the abdomen, 6 or 8 inches. This meant, of course, other large wounds, and very extensive hemorrhage. I would not say there were bones broken."

The deceased was shown to be an experienced and com- petent carpenter, employed as a foreman, and was earning about $140 per month.

On part of the defendant, it was shown that Lewis, an employee of the defendant's, was at work on the fourth floor. He testifies that Stukas had been on that floor, about 15 minutes before the accident, and then "went up to the sixth floor." The man operating the elevator on that day

was one Conway. Speaking of him, Lewis says:

"I saw Conway, immediately before the accident. He stopped the elevator on the fourth floor. I was about 15 feet from the elevator when he stopped. He got off and went south about 30 feet into a labeling room there. The elevator was then standing just right on the fourth floor. The accident happened just about a minute after that. My attention was attracted to the accident, because I heard the man holler. I was about 15 feet from the elevator. I got there as quick as I could, and looked up, and saw him caught. The elevator was on the sixth floor. I saw his left leg. As I stepped away from the elevator, Conway came from the labeling room to the elevator at the fourth floor."

The witness then went up the stairs to the sixth floor, and says that Conway reached that floor very shortly after —thinks not 20 seconds behind. He further says that, after reaching the sixth floor, he stepped in upon the elevator platform, and says that, after Stukas was released, and they were taking him below in the elevator:

"I asked him who took the elevator, and he said, 'I did.' I says, 'How did this happen?' He said, 'I stumbled and fell.' * * * I asked him again, on the way down, how it happened, and he said the same thing."

Conway, as a witness, says he was operating the elevator on that day, and, just before the accident, he spotted the elevator at the fourth floor, and went to the labeling room. Does not think he had been gone more than a minute; and, as he came out of the labeling room, he heard a scream, and, running to the elevator, saw Lewis going down the hall toward the stairway. Another unidentified person informed witness that a man had been caught on the sixth floor. Going up to that floor, he found four other persons already there: Lewis, Manske, and two carpenters. Nobody was then in the elevator with Stukas. Witness and others helped release him, and then took him below in the

elevator. He had seen Stukas before on that day, and, on that same afternoon, Stukas rode up in the elevator with him. Saw him again on the fifth floor, about 15 minutes before the accident. Witness further says it was practicable for a person on either floor to reach into the shaft and pull the cable which set the machinery in motion and bring the elevator to that floor; and that, on at least one occasion, on a Sunday, he saw Stukas enter the elevator on the first floor, and operate the lift up to the sixth floor—a thing to which the witness objected, told Stukas he must not do it, and that, when he wanted anything of that kind, he should call upon him.

One Schubert, a fifth floor man, was working some 40 feet from the elevator when Stukas came along, stopped momentarily, and went on in the direction of the elevator. Very soon thereafter, witness heard a moan, and, looking toward the elevator, saw a person's leg hanging down; and witness ran to the place, and shouted down the shaft for help. He then saw Conway thrust his head up from the fourth floor.

Manske was a sixth floor man. Saw Stukas on that floor, about seven minutes before he was hurt. Stukas said he was going down to the fifth floor and witness walked with him past the elevator to the stairway, which he descended. Witness heard the outcry twice, before he comprehended its significance, and, going to the elevator, saw Stukas in the position already described. Hanson and a carpenter were already there, and Lewis and Conway also soon appeared.

Sulzbach, testifying for the defendant, says that he went to the hospital where Stukas was taken, and while there, talked with the plaintiff's witness, Mrs. Snell, and that she told him Stukas had said to her that he had had one of his spells, and he could not help himself, and fell,

and that then he knew it was all over with him. This is denied by Mrs. Snell.

The foregoing, while not a complete *résumé* of the testimony, is sufficiently full to make clear the points to which the arguments of counsel are directed.

II. The first three propositions discussed on part of appellant may be considered together, as all of them go to the question of the competency and effect of the testimony admitted on part of the plaintiff, showing alleged statements by the deceased as to the cause of his injury. Referring to the first statement of this nature, which is said to have been made to the ambulance men who took the deceased from the place of the accident, to the effect that "the 'son of a bitch' would not stop the elevator when he hollered," it is objected that this was not an exclamation made as part of the occurrence, at or near the time of the accident, but was made after a considerable period of time elapsed, and was the mere narration of matters which were then in the past.

The same objection, but with added emphasis, is made to the testimony of the wife and sister, concerning the deceased's statements to them that he had caught his foot in the elevator, but the elevator man wouldn't stop, or was too frightened, or didn't know enough to stop; and that he caught his foot, as he was getting in the elevator, and, although he told the operator to stop, he didn't do it, but went away, leaving deceased alone.

The rule governing the admission of testimony of this nature varies but little in abstract statement by the courts generally, but there is quite a wide variance in the liberality of its application to concrete cases in different jurisdictions. It would be unprofitable to extend this opinion in an attempt to reconcile or explain any seeming inconsistencies in the precedents with which the books abound, as the views to which this court adheres have already been well

defined in our own decisions. *State v. Jones,* 64 Iowa 349, 353; *Keyes v. City of Cedar Falls,* 107 Iowa 509; *Alsever v. Minneapolis & St. L. R. Co.,* 115 Iowa 338; *Rothrock v. City of Cedar Rapids,* 128 Iowa 252; *Christopherson v. Chicago, M. & St. P. R. Co.,* 135 Iowa 409, 417; *Westcott v. Waterloo, C. F. & N. R. Co.,* 173 Iowa 355; *Dubois v. Luthmers,* 147 Iowa 315; *Peterson v. Phillips Coal Co.,* 175 Iowa 223, 228; *Vernon v. Iowa S. T. M. Assn.,* 158 Iowa 597, 600.

An examination of these cases demonstrates that this court is not in harmony with the extreme view entertained by some authorities, that, to be admissible as *res gestae,* the statements offered in evidence must have been spoken at the very time of the injury, or so near thereto as to be practically concurrent with the accident itself. As said by us in the *Dubois* case, supra:

"The time element, while important, is not controlling, under all circumstances."

We have repeatedly said that the proper test of admissibility of such statements "is whether they relate to the principal transaction and are explanatory of it, and are made under such circumstances of excitement, still continuing, as to show that they are spontaneous, and not the result of deliberation or design. * * * Within this general rule, the admissibility of the declarations under the circumstances of the particular case is largely within the discretion of the trial judge. The facts and circumstances of no two cases can be precisely alike, and the exact length of time is not mathematically controlling." See *Christopherson* case, supra; and this idea is, in substance, restated in the *Westcott* case, supra, which is relied upon by the appellant. Under that rule we have recognized as *res gestae* the statements of an injured person, concerning the cause and circumstances of his injury, made at more or less considerable intervals after the occurrence. In the *Rothrock* case, supra, the interval was about a half hour; in

the *Christopherson* case, supra, three quarters of an hour; in the *Keyes* case, an indefinite time, concerning which there was no proof except the plaintiff's own story.

So, in other jurisdictions, it has been held admissible to show as *res gestae* statements made fifteen minutes after the injury (*State v. Harris*, 45 La. 842, 844) ; the next day (*Lambright v. State*, 34 Fla. 564, 582) ; a half hour (*Augusta Factory v. Barnes*, 72 Ga. 218, 227) ; "some hours" (*Harriman v. Stowe*, 57 Mo. 93, 96) ; an hour (*Johnson v. State*, 8 Wyo. 494).

In *Insurance Company v. Mosley*, 8 Wall. 397, the Supreme Court of the United States says, of the *res gestae* rule, that:

"The tendency of recent adjudications is to extend, rather than to narrow, the scope of the doctrine. Rightly guarded in its practical application, there is no principle in the law of evidence more safe in its results. There is none which rests on a more solid basis of reason and authority."

It seems to be well settled in this state, as well as in many others, that there is no hard and fast rule, fixing with certainty the length of time beyond which the court may say, as a matter of law, that a statement made or act done is not a part of the *res gestae*. If the circumstances attending the injury, its nature and extent, the physical and mental condition of the person during the interim between his injury, and the statements offered in evidence, and all other proved facts by which the very truth of the situation may be tested, fairly indicate that such statements were the natural and spontaneous exclamations or declarations of the man, while still racked by the excitement, pain, and suffering from his mortal hurt, all the reasonable tests of admissibility are satisfied, although a few minutes, or even a longer time, elapsed between the crushing of his body and his declaration as to the cause of his misfortune.

On the other hand, if, from the showing made, it can reasonably be said that, before the statements were uttered, he had apparent time, opportunity, or disposition to reflect, and frame and give utterance to a falsehood, or, possibly, if it simply appear that his condition was such as to justify the reasonable belief that he could have indulged in such fabrication, then objection to the testimony should be sustained. It should be said at this point that the only item of the testimony relating to statements of the deceased and claimed to be admissible as *res gestae,* the admissibility of which may be open to doubt, is that which is given by the witness Mrs. Snell. The record does not disclose that any objection was made or exception preserved to such evidence, and it becomes unnecessary for us to pass upon the legal question which otherwise would arise. Brought to this test, we have no hesitation in saying that the trial court did not err in admitting the testimony offered by the plaintiff in this respect. The testimony being found competent, its weight and value are for the jury alone. This court cannot adopt the theory of counsel, that the fact that the deceased, when taken to the hospital and placed on the operating table, asked the surgeon to wait briefly until his wife could arrive, has any tendency to show a cunningly devised scheme on his part to get time to frame up a false account of his injury and communicate it to friendly witnesses.

That which we call human nature is not always nor altogether lovely, and it is barely possible that an occasional man may be found capable, under some circumstances, of pausing, with one foot over the threshold of eternity, to manufacture and give utterance to a deliberate lie; but that one in the condition of the deceased, with body horribly crushed, broken, and torn, undergoing inexpressible physical torture, calling upon the physician to administer something to relieve his suffering, and knowing, as he must have known, that he was looking into the face of death,

was, at the same time, craftily fabricating an untrue account of the manner and means of his misfortune, is too unreasonable to command belief, or, to say the least, is so manifestly improbable that its rejection by the jury is fully justified.

Not very unlike the case at bar in this respect is *Starr v. Aetna Life Ins. Co.*, (Wash.) 83 Pac. 113. The deceased, in that case, was discovered, very badly injured, and taken into a railway depot; and one Munger, living near by, was called. Munger took time to dress, before going to the station; and, after his arrival there, and about an hour from the time of the discovery of the injured man, the latter made a statement to Munger and a physician of the cause and manner of his injury; and died on the day following. In sustaining the admission of this statement in evidence, the court says:

"The ordinary rule is that a statement of this kind must have been made so recently that it would leave no room for collusion or premeditated self-serving. But no time can be arbitrarily fixed, it depending so largely upon the circumstances of each individual case."

Further discussing the question, the court said:

"In *Dixon v. Northern Pac. R. Co.*, 37 Wash. 310, we held that 15 minutes was not so long a time as would exclude the testimony; and in *Roberts v. Port Blakely Mill Co.*, 30 Wash. 25, we held that testimony given within three hours after a railroad accident could be admitted as *res gestae*. In this case, considering the facts that the man's associates had left him, that he was so mangled and crushed that an amputation of his arms was necessary, and that he died within 36 hours of the accident, it would be a violent presumption to indulge that the statement was made for a self-serving purpose; and we think that the refusal of the testimony under such circumstances would tend to work an injustice, by excluding testimony which would

have a tendency to throw light on a transaction which would otherwise be obscure, for want of evidence."

The simple truth seems to be that, from the time the deceased was caught and injured in the elevator, until his death, three or four hours later, he was, in fact, a dying man. His injury, his discovery in the elevator, his release therefrom, his removal down the elevator and into the ambulance, his being thence rushed to the hospital, and thence to the operating table, then the futile efforts of the surgeon, and the end of it all in death, were but the succession of intimately connected scenes, making up a single tragedy; and the story told by the deceased, if he did tell it, cannot be classed as a mere recitation of a past transaction.

For a. very thorough discussion of the *res gestae* doctrine, see 3 Wigmore on Evidence, Sections 1745–1757; also, *Bulkeley v. Brotherhood Acc. Co.*, 91 Conn. 727; *Roach v. Great Northern R. Co.*, (Minn.) 158 N. W. 232.

III. The appellant argues that, even if the testimony showing statements of deceased to Hennesy, Meis, Mrs. Snell, and Mrs. Stukas was properly admitted when offered, it should still have been stricken, upon the motion made therefor by appellant, because appellant showed by its witness Lewis that, before the alleged statement to the plaintiff's witnesses, Stukas had said to Lewis that he himself took the elevator, and got caught because he stumbled and fell. . It is hardly necessary to say that, if the plaintiff's evidence was properly admitted when offered (and we find it was), its retention in the record cannot be made erroneous by the fact that defendant thereafter put in evidence another alleged inconsistent statement, made a few minutes nearer the instant of the injury. The court cannot say, as a matter of law, that the story of the witness Lewis was true, and that, because thereof, the testimony of Hennesy, Meis, Mrs. Snell, and Mrs. Stukas

2. TRIAL: conflicting *res gestae*: effect.

must be discarded. If the jury believed the former, we may assume it would have promptly returned a verdict for defendant. Its verdict for the plaintiff indicates, however, that it did not credit Lewis's testimony in this respect, and did credit that which was given by the other witnesses mentioned.

There was no error in denying the defendant's motion to strike the testimony.

IV. It is earnestly contended in appellant's behalf that, considering the evidence as a whole, it negatives the possibility that deceased was injured by the negligence of the operator in charge of the elevator.

It is to be admitted that, upon some of the material facts, the case is a close one—close, not so much from lack of evidence to support the verdict, as from the fact that impartial minds may readily differ upon the weight and value of much of the testimony. This, however, was a problem for the solution of the jury; and, upon the record as made, we cannot assume to set aside its finding. Although witnesses say they saw Stukas on each of the three upper floors within a short time before the accident, and, when last seen, he was on the fifth floor, moving toward the elevator, and the witness on that floor says it was only a very short time, "a minute or so or less," before the cry of the injured man was heard, and although the witness on the fourth floor says that Conway had brought the elevator to that floor, and gone into the labeling room, 30 feet away, only a minute or so before the alarm, and the same witness says he saw Conway coming from the direction of the labeling room toward the elevator, "a minute or so after the accident happened," yet no witness is found or shown to exist who saw the deceased go to or enter the elevator, or interfere with it in any manner, or make any attempt to operate it; and no one except Conway himself professes

3. NEGLIGENCE: elevator accident.

any knowledge of Conway's whereabouts, or what he was doing between the time when Lewis says he saw him go into the labeling room, "about a minute before the accident happened," and the time when the same witness saw him coming from that direction, "a minute or so later, after the accident."

Under these circumstances, it will be presumed that deceased was exercising reasonable care for his own safety, and there is no conclusive showing of other facts which, as a matter of law, rebuts that presumption. Counsel's statement in argument, as a proved fact, that, when Conway brought the elevator to the fourth floor, and went to the labeling room, "Stukas, who was on the fifth floor, reached into the shaft, pulled the cable, and started the elevator up, and got caught" between the fifth and sixth floors, is not justified by the record. This, it is true, is the appellant's theory of the accident; but no witness testifies to its truth, and no one claims to have any personal knowledge of the facts so assumed. There is, of course, testimony which, so far as it goes, is consistent with counsel's theory; but, excepting the denials of Conway, the facts so relied upon are not necessarily inconsistent with plaintiff's theory.

**4. NEGLIGENCE: no eyewitness rule.**

The value of the testimony of Schubert, the fifth floor man, who says he saw Stukas going in the direction of the elevator, and of Lewis, who speaks of the movements of Conway, depends very largely, not only upon their credibility, but upon the accuracy of their memory and judgment concerning the time which elapsed before the alarm was given. It may be taken for granted that the time was comparatively short. The words "a minute," "about a minute," "a minute or less," "a minute or so," are among the commonest forms of expression for a "short time" or "short interval" or "brief period." As a rule, persons using them.

are not attempting to "speak by the watch," and no one so understands them.  And even if, by direct interrogation, the average person is asked to state his estimate of time between two more or less closely succeeding events to which his attention is not especially called until afterward, his answer of a "minute or so" or "an hour or so" may exceed or fall short of the actual interval to a very material degree.  It should have been said that communication between the floors of defendant's building is not limited to the elevators, but a stairway very near the elevator affords means of quick passage from one floor to another.  The passage of the elevators up and down the shaft, and of persons ascending and descending the stairs, must have been very commonplace matters, attracting little attention from the employees on the several floors.  Schubert, on the fifth floor, was at work 40 feet from the elevator, and facing the other way.  Lewis, on the fourth floor, was some 15 feet from the elevator, when Conway first appeared there.  So far as appears, there was nothing special or unusual in the fact that Stukas passed Schubert's place of work, going west, or in the fact that Conway passed south to the labeling room in the sight of Lewis, to impress the circumstance particularly upon the mind of either witness, or lead him, at the time, to notice just how many seconds or minutes elapsed between such appearance and the outcry which afterwards startled them.  All these things were proper matters for the jury to consider; and if therefrom, or from the demeanor of the witnesses on the stand, their apparent candor or lack of it, and from the reasonableness or unreasonableness of their respective stories, the jury found against the defendant's theory, it cannot be said that their verdict is without sufficient support in the testimony.

The fact, as pointed out by the appellant, that Mrs. Stukas and Mrs. Snell are interested witnesses, and that no other witness claims to have heard the alleged state-

ments to them by Stukas, is, of course, a legitimate argument to the jury; and we must presume that the jury did not overlook that element in the case. It may also be said that Lewis, who testifies to an alleged contradictory statement by Stukas, is in no manner corroborated by any of the four or more other persons who gathered about the injured man on the sixth floor, nor by Conway himself, who accompanied the deceased down the elevator to the ambulance. Moreover, it is to be said that the truth of the testimony of the women finds very material support in the testimony of the two ambulance men, who, so far as the record shows, are disinterested witnesses.

We find no reversible error in the case, and the judgment below is, therefore,—*Affirmed*.

LADD, C. J., GAYNOR and STEVENS, JJ., concur.